Michael Lee DAVIS, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 05–00–01205–CR to
05–00–01210–CR.

Court of Appeals of Texas,
Dallas.

Feb. 8, 2002.

John H. Hagler, Dallas, for Appellant.

William T. (Bill) Hill, Jr., Larissa Roeder, Asst. Crim. Dist. Atty., Dallas, for State.

Before Justices KINKEADE, RICHTER, and FRANCIS.

## OPINION

FRANCIS, Justice.

After a trial before the court, Michael Lee Davis appeals his one conviction for securing execution of documents by deception (SEDD) and five convictions for money laundering. The trial court assessed punishment for each conviction, enhanced by a prior felony conviction, at sixty years in prison and a $10,000 fine. Appellant was also ordered to pay restitution in the amount of $3,674,859.59. In four points of error, appellant complains the evidence was factually insufficient to support the convictions and insufficient to corroborate accomplice-witness testimony. In an additional four points of error, appellant contends the trial court erred in admitting certain testimony during the punishment hearing, the SEDD statute is unconstitutionally vague, and the trial court's award of restitution is erroneous. We agree that the trial court's restitution award is improper and, therefore, reverse that portion of the trial court's judgment awarding restitution and remand these cases to the trial court for a hearing so the trial court may determine a just amount of restitution to be paid to each victim of the offenses. We affirm the trial court's judgments in all other respects.

This appeal arises out of a highly complex scheme to defraud insurance companies that was carried out within the context of the viatical settlement industry. A viatical settlement is a transaction in which a terminally ill person insured by an existing life insurance policy sells the policy at a discount from its face value based on the insured's life expectancy. The purchaser becomes the policy beneficiary, receiving the policy proceeds upon the insured's death.

Dale Barron, chief counsel in the fraud unit of the Texas Department of Insurance, testified that several entities may be involved in a viatical transaction. The terminally ill insured, known as the "viator," often contracts with a viatical settlement broker that assembles the necessary documents and facilitates the sale of the policy. Typically, the policy is sold to a viatical settlement company, which may hold the

policy or resell it to investors. A viatical settlement company, unlike a viatical broker, may escrow funds from investors for the purchase of life insurance policies or their death benefits. At some point during a viatical settlement, an independent review of the viator's medical records is conducted to determine the viator's life expectancy. This review, known as a "mortality profile," drives the bidding and ultimate sale price for each policy.

Barron noted that while there is nothing unlawful about viatical settlements in general, the underlying scheme in this appeal involved the procurement and sale of new life insurance policies by individuals who had been previously diagnosed with a terminal illness. According to Barron, from April 1997 through October 1998, individuals who were HIV positive or had AIDS applied for life insurance with various companies but concealed their illnesses by answering falsely to the medical questions on the applications, a process described by Barron as "clean sheeting." The fraudulently obtained policies were then sold to unsuspecting purchasers through a viatical settlement company owned by appellant.

In his first and third points of error, appellant contends his convictions must be reversed because the evidence was factually insufficient to establish he knew of, or participated in, the alleged scheme to defraud the insurance companies or that the five checks forming the basis of the money laundering offenses were the proceeds of criminal activity.

■ A person commits SEDD if, with intent to defraud or harm, he causes another to sign or execute any document affecting property or service or the pecuniary interest of any person. TEX. PEN.CODE ANN. § 32.46(a)(1) (Vernon Supp.2002). The intent to defraud or harm may be established by circumstantial evidence. *See Williams v. State,* 688 S.W.2d 486, 488

(Tex.Crim.App.1985); *Obigbo v. State,* 6 S.W.3d 299, 305 (Tex.App.-Dallas 1999, no pet.). Moreover, a person is criminally responsible for the conduct of another if, acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX. PEN.CODE ANN. § 7.02(a)(2) (Vernon 1994). A person commits the offense of money laundering if he "knowingly: (1) acquires or maintains an interest in, receives, conceals, possesses, transfers, or transports the proceeds of criminal activity; (2) conducts, supervises, or facilitates a transaction involving the proceeds of criminal activity; or (3) invests, expends, or receives, or offers to invest, expend, or receive, the proceeds of criminal activity or funds that the person believes are the proceeds of criminal activity." TEX. PEN. CODE ANN. § 34.02(a) (Vernon 1994).

Appellant does not dispute that the insurance policies listed in the SEDD indictment were fraudulently obtained or that the funds from the five checks identified in the money laundering indictments were derived from the sale of fraudulently obtained policies. Instead, he argues the evidence established others fraudulently obtained the policies while he merely acquired the policies after the fact, totally unaware of the fraudulent scheme at the time he sold the policies.

■ In a factual sufficiency review, we determine whether a neutral review of all the evidence establishes that (1) the proof of guilt is so obviously weak as to undermine confidence in the fact finder's verdict, or (2) the proof of guilt, even if sufficient standing alone, is greatly outweighed by contrary proof. *See Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App. 2000); *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App.1996). In performing this review, however, we may not substitute

our judgment for that of the fact finder or substantially intrude upon its role as the sole judge of the weight and credibility to be given witness testimony. *See Johnson,* 23 S.W.3d at 6. In order to address appellant's complaints, we must first outline the details of the underlying scheme and its many participants, as revealed by the evidence at trial.

In March 1996, Hoyt Wauhob registered Southwest Viatical, Inc. as a viatical settlement broker with the Texas Department of Insurance. Wauhob was owner and president of Southwest Viatical. Appellant joined Southwest Viatical as vice president of marketing shortly before the company was registered with the State. Southwest Viatical's registration documents list appellant under the "key personnel" section. Excerpts from appellant's October 22, 1997 deposition, taken in connection with a Texas Department of Insurance investigation, were read into evidence. In the deposition, appellant stated that as vice president of marketing, he solicited potential viators to sell their policies to Southwest Viatical by speaking to persons at AIDS resource centers, attending AIDS-related functions, and talking with social workers at various hospitals. Appellant also indicated he received a commission on each policy sold to Southwest Viatical and formed a company known as First Texas Corporation to receive these commissions.

In April 1997, appellant registered First American Fidelity Corporation as a viatical settlement company with the Texas Department of Insurance. Appellant was listed as president of First American Fidelity. According to registration documents, First American Fidelity was owned by the First Texas Corporation, the same company that received commission checks from Southwest Viatical. Southwest Viatical and First American Fidelity shared a small office suite. First American Fidelity had an agency agreement with a company called First Financial Security to solicit purchasers for policies from First American Fidelity. Appellant used Charter Escrow Company to hold investor funds and the insurance policies.

According to Wauhob, after appellant set up First American Fidelity, he and appellant agreed Wauhob would procure policies and appellant would sell them. Wauhob stated that very early on he and appellant discussed obtaining multiple new policies on viators, which Wauhob would then sell to appellant. Wauhob noted they began this process in April 1997 and continued until about the third quarter of 1998. Wauhob also indicated his financial arrangement with appellant varied depending on whether the insurance policy was contestable or noncontestable. Several witnesses at trial testified that life insurance policies have a two-year contestability clause. Policies less than two years old could be cancelled for reasons such as fraud. Policies over two years old, however, could only be cancelled for failure to pay premiums. If appellant purchased a contestable policy, Wauhob would receive money back and appellant would make his money when he sold the policy. For noncontestable policies, appellant would receive a commission check from Wauhob. All policies that were part of the clean sheeting scheme were contestable policies.

Five viators testified at trial. Each had previously pleaded guilty to SEDD or other offenses relating to their participation in the fraudulent scheme. According to their testimony, each initially went to Southwest Viatical with pre-existing life insurance policies to sell. After their existing policies were sold, Wauhob contacted them and suggested they apply for additional insurance policies. Wauhob then sent the viators to Sammy Squyres, an insurance agent. With Squyres, each

viator signed four or five insurance applications. The applications were "clean sheeted"—false answers were given to questions regarding the current status of the viator's health. In addition to being reimbursed for the premiums on the new policies, each viator received additional money for the new policies.

Although none of the viators testified that appellant directly solicited them to obtain the new policies or assisted them in the application process, there was viator testimony suggesting appellant was aware of or part of the scheme. One viator indicated he was talking with Wauhob and appellant (who was walking in and out of the office) when Wauhob asked, "[W]ould you like to make some money?" and suggested he sign up for more life insurance policies. This same viator also asked Wauhob and appellant what the consequences would be if the insurance companies found out what they were doing. He was informed that it would just be a simple breach of contract and the policies would be cancelled.

Another viator, after receiving threatening letters from an insurance company regarding his answers to health questions on his application, confronted Wauhob at the Southwest Viatical office. Wauhob went into another room to speak with appellant, and then appellant came out and reassured the viator he had nothing to worry about. A third viator testified he confronted Wauhob at Southwest Viatical after unauthorized withdrawals were made from his bank account for new policy premiums. Wauhob spoke with appellant in appellant's office, then returned to reassure the viator everything would be handled. A fourth viator indicated appellant wrote him a $5,000 check for one of the new insurance policies he acquired. Appellant met the viator at the bank to personally verify the check after the viator had trouble cashing it. Another viator testified appellant was present when he signed assignment of interest forms on three new policies. Appellant's signature appears on these documents, which assigned the policies to Charter Escrow.

Sammy Squyres testified about his role in the fraudulent scheme. Although Squyres indicated he had limited contact with appellant who "stayed in the background," he did recount one meeting with appellant and Wauhob in June 1997, about three months after the scheme was implemented. At that meeting, Squyres explained to appellant and Wauhob the delay in receiving the new policies. They also had a general discussion about obtaining offshore accounts, shelf companies, and false identification as ways to hide money.

David Garner, president and owner of Charter Escrow, also testified at trial. Garner indicated that appellant arranged to use his company for escrowing the policies to be sold and for purchaser funds. According to Garner, when appellant brought insurance policies to Charter Escrow, each policy generally would be accompanied by a change of beneficiary form naming Charter Escrow as the beneficiary. Garner further indicated that appellant instructed him to hold the change of beneficiary forms in escrow until the two-year contestability period had expired. Appellant told Garner insurance companies did not like the viatical business, and a change of beneficiary form naming an escrow company would cause the insurance company to investigate and most likely cancel the policy. Charter Escrow would hold policies in escrow and, when the viator died, Charter Escrow would receive the policy proceeds and then disburse them according to appellant's written instructions.

As noted above, Charter Escrow would also hold purchaser funds. Garner explained that appellant would bring files to

Charter Escrow for "closing." At that time, appellant provided an instruction letter signed by him that, among other things, identified the particular insurance policy, named the purchasers and their respective interests in the policy, and informed Charter Escrow what amount to escrow for future premiums and other expenses. The letter would also outline how much money from the purchaser funds was to be disbursed to appellant's company, First American Fidelity.

Ron Heatherly testified he operated First Financial Security. Appellant suggested to Heatherly that First Financial Security act as a funding company to deal with brokers who solicited purchasers for the insurance policies. Threlkeld & Company subcontracted with First Financial Security to obtain investors. Heatherly testified appellant gave him access to files on each viator that included life expectancy information and medical records.

Kathy Kelly of the Texas Department of Insurance analyzed the bank records of First American Fidelity and First Texas Corporation. Among other things, Kelly's testimony traced the five Charter Escrow checks deposited into First American Fidelity's bank account that were the subject of the money laundering offenses. Kelly indicated that from the First American Fidelity account, appellant wrote checks to First Texas Corporation, Southwest Viatical, and Southwest Viatical, L.L.C., a separate entity from Southwest Viatical, Inc. with its own bank account. The majority of the funds from these Charter Escrow checks, however, ended up in accounts owned or controlled by appellant and were ultimately transferred out of the country to appellant's overseas account. Wauhob used Southwest Viatical, L.L.C. as a viatical settlement broker, but for purposes of this opinion, Southwest Viatical refers to both entities unless otherwise indicated.

Mortality profiles were prepared by Prognosis Services of America (PSA). Wauhob testified that he helped set up PSA, which was started by a former girlfriend. He indicated PSA initially shared office space with Southwest Viatical. The mortality profiles from PSA were typically requested by either Southwest Viatical or First American Fidelity, but were specifically directed to appellant's attention. The medical records on which the mortality profiles were based were provided by Southwest Viatical. These mortality profiles often indicated the viators had been diagnosed HIV positive or with AIDS before the issue dates of the policies appellant was selling. Barron pointed out that some of the mortality profiles used to sell the clean-sheeted policies were prepared even before the policies were issued.

Appellant argues that because he never received the insurance applications with the policies, he did not know the policies were fraudulently obtained. Moreover, he asserts there was no evidence that he actually read the mortality profiles. Appellant further contends Wauhob's testimony that he and appellant discussed obtaining new policies on viators is insufficient because he did not outline the details of their conversation. After reviewing all of the evidence, we do not agree the evidence was factually insufficient to support the convictions.

■ Although appellant may never have directly solicited or assisted viators in submitting the fraudulent applications to the insurance companies, testimony from Wauhob indicated he and appellant discussed this plan as part of an overall scheme in which appellant would sell the fraudulently obtained policies. Squyres also testified about being at a meeting with appellant and having discussions about the delay in obtaining the new policies as well as methods of hiding assets. Viators testified ap-

pellant appeared to be aware of the scheme and that Wauhob would seek appellant's assistance when various problems arose. Additionally, mortality profiles addressed to appellant's attention indicate that viators were diagnosed with HIV or AIDS prior to the issue dates of the policies. In fact, some of the mortality profiles were prepared before the policies were even issued.

Appellant's settlement company was set up at the same time the scheme to obtain the policies began. Appellant met viators when Southwest Viatical sold their initial policies. The viators could only have sold their policies if they had been diagnosed with a terminal illness. Appellant was aware these same individuals were now obtaining multiple new life insurance policies with various companies. While appellant may not have been involved in the actual solicitation of viators and the procurement of the policies, his contact with Wauhob and Southwest Viatical, as this scheme was conducted, was pervasive. Additionally, appellant placed himself in the most lucrative position of this scheme—selling the fraudulently obtained policies to unsuspecting purchasers. Although he argues the contrary, appellant appears to be the only one who had contact with all the various participants, from the viators to the ultimate purchasers and everyone in between.

Based on the evidence outlined above, we conclude the evidence was factually sufficient to prove appellant knowingly played an integral part in the procurement and sale of fraudulently obtained insurance policies and knew the proceeds he received from the sale of those policies were the result of criminal activity. *See Johnson,* 23 S.W.3d at 11. We overrule appellant's first and third points of error.

In two related points of error, appellant complains there is insufficient evidence to corroborate the accomplice testimony because the nonaccomplice testimony established that appellant merely acquired and then sold policies obtained by Wauhob, but failed to establish appellant's knowledge and participation in the fraudulent scheme. It is not disputed that Wauhob, Squyres, and each testifying viator were accomplices. Wauhob admitted participating in the fraudulent scheme and testified under a grant of immunity. Squyres admitted to submitting or writing false life insurance policy applications for persons previously diagnosed with HIV or AIDS and pleaded guilty to one SEDD offense and two forgery offenses. Each viator also pleaded guilty to offenses relating to the fraudulent scheme.

 Generally, a conviction cannot be based upon the testimony of an accomplice unless it is corroborated by other evidence tending to connect the defendant with the offense committed. TEX.CODE CRIM. PROC. ANN. art. 38.14 (Vernon 1979). When determining whether an accomplice's testimony is corroborated, we eliminate the accomplice testimony and review the remaining evidence to decide whether it tends to connect the appellant to the offense. *See Hernandez v. State,* 939 S.W.2d 173, 176 (Tex.Crim.App.1997). The corroborative evidence, however, need not establish the appellant's guilt of the charged offense nor directly link him to the crime. *Id.* Instead, any independent evidence verifying the accomplice's version as opposed to the defendant's version is corroborative, even if it only relates to a mere detail as opposed to a substantive connection between the defendant and the offense. *Lee v. State,* 29 S.W.3d 570, 577 (Tex.App.-Dallas 2000, no pet.). Further, while presence alone is insufficient to corroborate accomplice-witness testimony, presence coupled with other suspicious circumstances may constitute sufficient cor-

roboration. *See Trevino v. State,* 991 S.W.2d 849, 851 (Tex.Crim.App.1999).

■ Here, the corroborative evidence included Barron's expert testimony, Kelly's analysis of the bank accounts of key parties, as well as testimony from nonaccomplice witnesses. The record in this case also contains about 12,000 pages of documentary evidence. This evidence includes business records from the defrauded insurance companies, the Texas Department of Insurance, Charter Escrow Company, First Financial Security, and Southwest Viatical. Also included are bank records from Southwest Viatical, First American Fidelity, and First Texas Corporation evidencing the financial transactions among the various corporate entities and individual participants. Additional records indicate that appellant, Squyres, and Wauhob each purchased or established an offshore company in the Bahamas.

The documentary evidence also confirms appellant had contact with viators involved in the scheme and wrote checks to them. Documents in Charter Escrow's files contain the insurance policies as well as closing instruction letters signed by appellant outlining, among other things, the exact amount of money to be escrowed for future policy premiums, the amount to be distributed to First American Fidelity, and directions about when to send certain change of beneficiary forms to the insurance companies so they would be delivered after the contestability period had expired. Mortality profiles directed to appellant's attention were found in First Financial Security files, along with First American Fidelity purchase agreements with appellant's signature. Various documents in the record indicate that appellant sold new policies issued to viators for whom he had previously sold legitimate policies. The recurrence of the same viators selling multiple policies within such a short period of time is an additional suspicious circumstance supporting a finding that appellant was part of the scheme. Moreover, appellant's documented purchase of an offshore Bahamian company only one month after he was deposed as part of the Department of Insurance investigation supports a finding of appellant's guilty knowledge and participation. This also supports Squyres's testimony regarding his meeting with appellant at which offshore companies were discussed. We conclude the accomplice testimony is sufficiently corroborated and overrule appellant's second and fourth points of error.

In his fifth point of error, appellant challenges the admission of testimony during the punishment hearing that he aided another in shooting a fourteen-month-old baby lying in a crib. He claims the testimony was irrelevant and substantially more prejudicial than probative. Specifically, appellant argues this testimony (1) constituted extraneous victim impact evidence with respect to a victim not named in the indictment and (2) clearly had an emotional impact suggesting the trial court's sixty-year sentence in each case was based on emotions rather than the other relevant evidence admitted at trial.

■ A trial court has broad discretion in determining the admissibility of evidence presented at the punishment phase of trial. *See Moreno v. State,* 1 S.W.3d 846, 861 (Tex.App.-Corpus Christi 1999, pet. ref'd). The code of criminal procedure permits trial courts to admit evidence deemed relevant to sentencing, including evidence of other crimes or bad acts. *See* TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (Vernon Supp.2002); *Tracy v. State,* 14 S.W.3d 820, 825 (Tex.App.-Dallas 2000, pet. ref'd). At the punishment hearing, relevant evidence is that which assists the fact finder in determining

the appropriate sentence given the particular defendant in the circumstances presented. *See Rogers v. State*, 991 S.W.2d 263, 265 (Tex.Crim.App.1999). Even relevant evidence, however, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403. As used in rule 403, "unfair prejudice" means the undue tendency of the evidence to suggest a decision on an improper basis. *See Rogers*, 991 S.W.2d at 266. We will not disturb a trial court's determination regarding the admissibility of relevant evidence unless an abuse of discretion has been shown. *See Green v. State*, 934 S.W.2d 92, 101–02 (Tex.Crim.App.1996).

During the punishment hearing, a former Houston homicide detective testified about the facts and circumstances underlying appellant's three murder convictions in 1981 that were alleged in a single enhancement paragraph in the SEDD and money laundering indictments. The detective also identified the other participants in the murder of a husband, wife, and infant child for insurance and inheritance benefits. He outlined the details of the crime and appellant's participation, which included pointing the gunman to the nursery where the infant was lying in a crib. The gunman then shot the baby in the back of the head.

■■■ The facts surrounding appellant's prior convictions were relevant to the trial court's punishment determination. *See Johnson v. State*, 988 S.W.2d 958, 960 (Tex.App.-Beaumont 1999, no pet.). Moreover, contrary to appellant's position, we do not view the recitation of the basic facts surrounding appellant's participation in the infant's murder comparable to the victim impact evidence held to be improperly admitted in *Reese v. State*, 33 S.W.3d 238 (Tex.Crim.App.2000). Unlike *Reese*, which involved the admission of a photograph of a murder victim and her unborn child in a

coffin, here we are faced with testimony concerning the manner and method of the infant's murder for which appellant was convicted. Bonds's testimony was not victim impact testimony.

Moreover, although the testimony may have had some emotional impact by the very nature of the acts described, we cannot conclude the trial court abused its discretion in admitting the evidence. The evidence was probative of the details of appellant's prior convictions, and the potential to influence the fact finder (here a trial judge) in an irrational way was tempered by the manner in which the evidence was presented and the limited time taken to present the evidence. *See Wyatt v. State*, 23 S.W.3d 18, 26 (Tex.Crim.App.2000) (setting out standards for reviewing rule 403 challenges). The testimony was extremely instructive concerning appellant's character and was admissible to aid the trial court in setting punishment. *Id.* We conclude there is no reversible error in connection with the admission of this testimony.

■■■ In his sixth point of error, appellant contends the SEDD statute is unconstitutionally vague. As noted above, the statute provides in part: "A person commits an offense if, with intent to defraud or harm any person, he, by deception causes another to sign or execute any document affecting property or service or the pecuniary interest of any person." Tex. Pen.Code Ann. § 32.46(a)(1). When reviewing the constitutionality of a statute, we presume its validity and that the legislature has not acted unreasonably or arbitrarily in its enactment. *See Ex parte Granviel*, 561 S.W.2d 503, 511 (Tex.Crim.App.1978). The party challenging the statute has the burden of proving its unconstitutionality. *Sullivan v. State*, 986 S.W.2d 708, 711 (Tex.App.-Dallas 1999, no pet.). The statute will be upheld if we can

determine a reasonable construction that renders it constitutional and effectuates the legislative intent. *Id.* A statute is void for vagueness when it fails to give a person of ordinary intelligence fair notice of what the statute requires or is so indefinite that it encourages arbitrary arrests and convictions. *See Long v. State,* 931 S.W.2d 285, 287 (Tex.Crim.App.1996).

Appellant urges the statutory language fails to define the SEDD offense in a manner sufficient to inform him whether his conduct in this case would constitute a criminal offense. Appellant specifically complains about the word "affecting," noting that "affecting" is not defined in the statute.

▇▇▇▇ When the statute does not involve constitutionally protected conduct, we engage in a two-part analysis, first applying the statute to the appellant's conduct and next determining whether the statute is vague in all its applications. *See Sullivan,* 986 S.W.2d at 712–13. Applying the statute to appellant's conduct, we reject his complaint that the statute failed to inform him that involvement in a scheme to obtain fraudulently life insurance policies from insurance companies was prohibited conduct.

▇▇▇▇ The mere failure to define "affecting" does not make a statute unconstitutionally vague. *See Engelking v. State,* 750 S.W.2d 213, 215 (Tex.Crim.App.1988). Instead, when words are not statutorily defined, we construe them in the context in which they are used and in accordance with the rules of grammar and common usage. *See Bynum v. State,* 767 S.W.2d 769, 774 (Tex.Crim.App.1989). The term "affect" is defined as "to produce an effect upon" or "to produce a material influence upon or alteration in." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 35 (1981). Here, the life insurance policies written in response to the false applications clearly had a material influence on the property or pecuniary interest of the companies that issued them.

In fact, a sister court has summarily rejected the argument that "affecting" as used in the SEDD statute is unconstitutionally vague, noting that Texas courts have had no difficulty in interpreting and applying the word "affect." *Stone v. State,* 662 S.W.2d 620, 622 (Tex.App.-Houston [14th Dist.] 1983, pet. ref'd). Like the appellant in *Stone,* appellant does not cite any authority to support his contention that the SEDD statute is unconstitutionally vague because of the use of the word "affecting." "Affecting" is a simple word with a plain meaning that clearly conveys to the public the legislature's intent to criminalize the act of causing another to execute a document, by means of deception, impacting or influencing the property, service, or pecuniary interest of a person if such act was done with the intent to defraud. We therefore reject appellant's constitutional challenge and overrule his sixth point of error.

In his seventh and eighth points of error, appellant complains about the trial court's order compelling him to pay restitution to sixty-six specified purchasers totaling $3,674,859.59. Appellant contends the trial court erred in ordering restitution to persons who were not connected with the indictments. Additionally, appellant challenges the trial court's method for determining the amount of restitution awarded. In its brief, the State agrees the restitution order improperly includes five persons who purchased only legitimate policies, and also acknowledges seventeen of those named in the restitution order purchased policies that are not connected in any way to the six indictments.

▇▇▇▇ The decision to order restitution rests within the discretion of the trial court. *See Campbell v. State,* 5 S.W.3d 693, 696–97 (Tex.Crim.App.1999). However, a trial court's authority to order resti-

tution is limited to those victims of the offenses for which the defendant is charged. *See id.* at 697. Here it is undisputed that the trial court erred by awarding restitution to those not victims of the SEDD and money laundering offenses. Moreover, the amount of restitution awarded by the trial court was improper because it was based upon the victims' expectation interest in the face value of the policies rather than their actual loss. *See* TEX.CODE CRIM. PROC. ANN. art. 42.037(b)(1)(B)(i) (Vernon Supp.2002); *Campbell,* 5 S.W.3d at 696–97. At oral argument, both the State and appellant agreed this matter must be sent back to the trial court for a hearing to determine those entitled to restitution. We therefore remand this matter to the trial court for a hearing to determine a just amount of restitution for individuals who are victims of the offenses for which appellant was convicted.

We remand these causes to the trial court for a hearing on restitution. We affirm the judgments in all other respects.