Becker v. State



COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS



)
 

RICKY GLEN GRUMBLES,
)
 No. 08-01-00436-CR

)


 Appellant,
)
 Appeal from

)
 

v.
)
 70th District Court

)


THE STATE OF TEXAS,
)
 of Ector County, Texas

)


 Appellee.
)
 (TC# A-28,268) 


O P I N I O N



 Ricky Glen Grumbles appeals his conviction for two counts of aggravated robbery, enhanced
by two prior felony convictions. A jury found Appellant guilty and assessed his punishment at
imprisonment for a term of ninety-nine years. The trial court entered in the judgment an affirmative
finding on the use of a deadly weapon. Tex.Code Crim.Proc.Ann. art. 42.12, § 3g(a)(2)(Vernon
Supp. 2003). We affirm.

FACTUAL SUMMARY


 Sheila and Bob Black were at their home in Odessa on the evening of April 15, 2000. At
about 8:30 p.m., Sheila was in the kitchen fixing supper because they were expecting Sheila's
stepbrother, James Glidwell, to arrive. While Bob was in the bathroom, a man later identified as
Appellant knocked on the door and said that he needed to speak with Sheila's husband about moving
their Cadillac into the garage because he was going to work on it. Sheila invited him in and he sat
down at the table. They made small talk until Bob stepped back into the kitchen. When Bob asked
how he could help him, Appellant lifted up his shirt, pulled out a large chrome handgun from inside
his pants, and pointed it at them. Appellant then ordered them to sit down with their backs to him. 
While holding the gun by their heads, he told them that Bob had made some enemies and he had
been hired to rob them and have sex with Sheila while Bob was forced to watch. Both Bob and
Sheila believed he was going to kill them.

 Appellant removed Sheila's necklace, earrings, and a ring and demanded Bob's jewelry and
guns. He also took Bob's wallet which contained about $12,000 in cash. Appellant forced the
Blacks to crawl from the kitchen to the bedroom and then lay face down on the bed. He tied their
hands and feet with pieces of a pillowcase. Appellant went into the closet and retrieved two rifles
and a shotgun. Upon seeing a pair of boots in the closet, he also questioned Bob about his boot size
but he did not take them as they were the wrong size. Appellant sat down in a rocking chair next to
the bed and pointed the gun to Sheila's temple while asking her whether there was anything else of
value in the house. Appellant asked Bob whether he had another billfold in his pocket. Bob told
him yes and Appellant pulled a billfold containing $5,000 out of Bob's back pocket. He also took
jewelry out of a jewelry case in the bedroom as well as Bob's ring and Rolex watch from the kitchen. 
 At about this time, the Blacks heard James Glidwell briefly knock on the door, then he
entered the house and gave them his normal greeting. Shortly thereafter, the Blacks heard four
gunshots. Bob was somehow able to get his knife out of his pocket and freed their hands and Bob's
feet. When Sheila rolled over, she saw James leaning against their bedroom door covered in blood. 
Sheila, whose feet were still tied, hopped to the phone and called 911 while Bob helped James to the
floor. Appellant had shot James four times at close range injuring his chest, abdomen, and arm. 
Appellant immediately fled the residence with the Blacks' property. The emergency dispatcher gave
Sheila instructions to assist James until help could arrive. Within a few minutes, sheriff's deputies
and an ambulance arrived at the residence. The ambulance transported James to a hospital where
he underwent emergency surgery necessary to save his life.

 Sheriff's deputies obtained a description of the robber from the Blacks. They described him
as a white male in his late 30's, with a mustache, white baseball cap, white tennis shoes, and a
western style plaid shirt. The officers also learned that the suspect had been driving a white pickup. 
Approximately thirty minutes after the robbery, Allen Chitwood, a Midland County Deputy Sheriff,
heard the broadcast about the robbery and saw a white pickup near the airport in Midland. The
driver of the vehicle matched the description given of the robber. At trial, Chitwood identified the
driver of the white pickup as Appellant. Chitwood stopped the pickup but Appellant would not get
completely out of the pickup. Appellant kept the right side of his body turned as he motioned for
Chitwood to approach. Concerned for his safety, Chitwood refused. Appellant suddenly got back
in the pickup and fled. Appellant drove a short distance before crashing through a barbed wire fence
into a pasture. Appellant continued driving through the pasture but Chitwood did not pursue him
in the patrol car because he was familiar with the area and knew his patrol car could not handle the
rough terrain. Chitwood and other deputies attempted to organize a perimeter around the area but
Appellant managed to evade them. They later found the vehicle in another part of the pasture. In
the vehicle, investigators found eleven rounds of 9 mm ammunition. Additionally, they recovered
Bob Black's rifles and a shotgun under some mesquite bushes approximately fifty to seventy-five
yards from the white pickup.

 Shirley Timmons, a forensic artist, met with Sheila Black on the day following the robbery
and created a composite sketch of the assailant. The sketches were publicized by releasing them to
the local news media and a lead developed within a few days. Based upon this lead, the investigation
began to focus on Appellant. The investigators contacted Appellant's girlfriend, Janis King, and
obtained information regarding his whereabouts. They initially attempted to locate Appellant at a
bar but he fled in a blue and gray Suburban which he had purchased for $1,200 cash only one or two
days after the robbery. Curtis Becker, a sergeant with the Texas Rangers, fired five shots at
Appellant as he drove past because he believed Appellant was going to run over Sergeant Roddy
Eaton of the Ector County Sheriff's Office. The shots did not strike Appellant and because he drove
his vehicle through a pasture, officers were unable to follow in their patrol cars. King later informed
the investigators that Appellant was in Room 107 at the Super 8 Motel in Odessa. Law enforcement
personnel executed a search warrant at the motel but did not find Appellant. 

 On April 18, 2000, Mike Tacker of the Odessa Police Department met with Carl Rogers, and
Curtis Becker to participate in a manhunt for Appellant in an area where he had been spotted. While
talking with other law enforcement personnel, Tacker saw Appellant looking out of an abandoned
house. Officers secured the perimeter around the residence and fired OC pepper spray into the
building after Appellant refused repeated requests to surrender. Fearing that Appellant had escaped,
they approached with K-9 dogs and determined that Appellant was still hidden in the building. The
officers entered and found Appellant hiding in the kitchen cabinets. They also found $8,800 in the
house.

 Appellant initially refused to submit to an interview or give a statement about the robberies
and shooting of Glidwell. Following his arraignment on the attempted capital murder charge,
however, Appellant asked if he could speak with the investigators. Thus, on April 22, 2000,
Appellant waived his rights and gave a recorded statement to Carl Rogers. Appellant insisted that
he acted alone in committing the offenses and he had made the statements to the Blacks about
committing the crimes on behalf of someone else because he wanted to scare them in the hope that
they would not identify him. Appellant decided to rob the Blacks because he knew Black had a habit
of keeping large sums of money in his truck. After taking numerous items of property including
Bob's wallets, jewelry, and the guns, Appellant heard a door open. He ran into the utility room
where he saw Glidwell and "just started shooting." Appellant shot Glidwell from a distance of no
more than four or five feet. He did not recall Glidwell saying anything or doing anything that he
considered confrontational or aggressive. After shooting Glidwell, Appellant returned to the
bedroom for the guns and other property and ran out of the house.

 Sandra Kay Baker, Appellant's cousin, spoke with Appellant following his arrest. He
instructed her to rent Room 107 at the Super 8 because there was money hidden in the room. He
asked her to get the money and send it to his mother. On May 4, Baker went to Room 107 and found
eighteen $100 bills hidden under the carpet. Unaware of Appellant's involvement in the robbery,
she put the money in a coffee can and took it back to her home with the intention of sending it to
Appellant's mother. That same day, she was contacted by Sergeant Carl Rogers with the Ector
County Sheriff's Department. Rogers met with her and she turned over the money to him. Rogers
later found an additional twenty $100 bills hidden under the carpet in Room 107. In the same room,
he found the 9 mm weapon used in the robbery. It had been hidden beneath a nightstand. A grand jury indicted Appellant for the attempted capital murder of Glidwell (Count I) and
the aggravated robberies committed against the Blacks (Counts II and III). The jury could not reach
a verdict on the attempted capital murder charge but found Appellant guilty of Counts II and III. The
trial court granted a mistrial as to Count I but accepted the guilty verdicts over Appellant's objection. 
FINDINGS OF FACT


 In Issue One, Appellant complains that the trial court failed to file findings of fact and
conclusions of law with respect to the voluntariness of Appellant's statements. By written order, we
abated the appeal so that findings of fact and conclusions of law could be entered pursuant to
Tex.Code Crim.Proc.Ann. art. 38.22, § 6 (Vernon 1979). The trial court's findings and
conclusions have since been made part of the appellate record. Issue One is overruled.

ADMISSIBILITY OF STATEMENTS


 In Issue Two, Appellant contends that the trial court erred in admitting two of his statements
and evidence discovered as a result of his statements because he was not given the warnings required
by Miranda (1) or Article 38.22, § 2. Additionally, he argues that the trial court erroneously concluded
that he was not in custody when his second statement was made. After initially refusing to waive
his Miranda rights and speak with law enforcement officials, Appellant made three different
statements: an oral statement on April 22, 2000 (Statement No. 1); an oral statement on May 4, 2000
(Statement No. 2); and a written statement on October 13, 2000 (Statement No. 3). We will
separately address Appellant's arguments pertaining to Statements 1 and 2.

Statement No. 1


 Statement No. 1 is a recorded statement and contains the following admonitions provided
by Deputy Carl Rogers:

 Let me do this at this point. I'm going to read you again -- I know you've heard this
several times, but I'm going to read it to you again for purposes of the case. You
have the right to remain silent; anything you say can and will be used against you in
a court of law. You have the right to talk to a lawyer and have them present with you
while you are being questioned. If you cannot afford to hire a lawyer, one will be
appointed to represent you before any questioning if you wish. You can decide to at
anytime to exercise these rights and not answer any further questions or make any
further statements. [Emphasis added.]


Appellant waived these rights and gave a recorded statement to Rogers and the other law
enforcement officers present regarding his commission of the robberies and the shooting of Glidwell. 
At trial, Appellant generally objected to the admission of Statement No. 1 on the ground that he had
not been given the warnings required by Article 38.22, § 2. When asked by the trial court to be more
specific, Appellant stated that the warnings given did not strictly comply with subsections 1 through
5 of the statute. The trial court overruled the objection and admitted the recorded statement. In
written findings of fact and conclusions of law, the trial court found that Appellant was provided
with the warnings required by Article 38.22, § 2(a) and voluntarily waived them. 

 Although Appellant complained at trial that none of the warnings were adequate, his
argument on appeal centers on the warnings required by Article 38.22, § 2(a)(1) and (2):

 (1) he has the right to remain silent and not make any statement at all and that any
statement he makes may be used against him at his trial;


 (2) any statement he makes may be used as evidence against him in court.

Tex.Code Crim.Proc.Ann. art. 38.22, § 2(a)(1), (2).

 An oral recorded statement of an accused is inadmissible unless he is given the warnings set
forth in Article 38.22, § 2(a). Tex.Code Crim.Proc.Ann. art. 38.22, § 2(a). Warnings which
convey the exact meaning of the statute but in slightly different language are sufficient to comply
with the statutory requirements. White v. State, 779 S.W.2d 809, 827 (Tex.Crim.App. 1989), cert.
denied, 495 U.S. 962, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990). Citing State v. Subke, 918 S.W.2d
11 (Tex.App--Dallas 1995, pet. ref'd), Appellant argues that the warnings given did not comply with
the statute because he was not advised that the statement could be used against him at his trial, but
was only told it could be used against him in a court of law. In Subke, the officer taking the
videotaped statement advised the defendant that his statement would be used against him at his trial
but he did not warn Subke that it could be used against him in a court. Subke, 918 S.W.2d at 12. 
Subke filed a motion to suppress because both warnings had not been given. Id. at 13. Finding that
there was a difference between statements being used in "trial" and "in court," the trial court granted
the motion to suppress, and the State appealed. Id. The Dallas Court of Appeals held that the
Legislature deliberately placed both warnings in the statute to inform the accused of his rights. Id.
at 14-15. Because Subke was not informed that any statement could be used against him in court,
the court of appeals rejected the State's argument that there had been substantial compliance. Id.

 The instant case presents the opposite situation. Here, the warnings informed Appellant that
the statements could be used against him "in a court of law," but did not specifically inform him that
it could be used at his trial. As such, the warning given combined elements of subsections (a)(1) and
(a)(2). Unlike what occurred in Subke, there has not been a total failure to provide one of the
warnings. We conclude that the warnings given conveyed the exact meaning of the statute but in
different language. It is common knowledge that trials take place in court. A person who is warned
that his statement will be used against him in a court of law would understand that it could be used
against him at his trial. Because the warnings substantially complied with Article 38.22, § 2(a), the
trial court did not abuse its discretion in admitting Statement No. 1.


Statement No. 2


 The following evidence was introduced outside the presence of the jury. Appellant agreed
to submit to a polygraph examination and was taken to the DPS offices on May 4, 2000. Polygraph
examiner David Crider conducted a pre-interview of Appellant in the presence of the same officers
who conducted the first interview of Appellant--Carl Rogers and Curtis Becker. The substance of
the entire conversation was not shown at trial but Rogers stated the following regarding the pre-interview:

 [Rogers]: [Appellant] was taken over there, he was pre-interviewed by the polygraph
operator, David Crider. During the course of their interview -- that interview the
subject of the gun came up. And the end result was that [Appellant] made a verbal
statement as to where that gun could be located as far [as] he knew at that time. 


 Appellant told Crider that the gun he had used in the robbery was hidden in Room 107 at the
Super 8 Motel. (2) Rogers and Becker went to the Super 8 Motel and learned that Appellant's cousin,
Sandra Baker, had rented Room 107 that same day. Rogers obtained a consent to search the room
from Baker and found the gun hidden under the nightstand. Appellant objected to the admission of
any statements about the discovery of the gun because the statement had not been record as required
by Article 38.22, he had not been given his Article 38.22 or Miranda warnings, and no new evidence
was discovered. The trial court overruled the objections and permitted Rogers to testify that he
recovered the 9 mm weapon from Room 107 of the Super 8 Motel "as a result of information
received in a meeting that day with [Appellant]." In the written findings of fact and conclusions of
law, the trial court found that Appellant was in custody but not subjected to custodial interrogation
when he made the statement. Additionally, the court determined that Article 38.22, § 2(a) did not
apply to the statement because it contained assertions of fact which led to the discovery of the
instrumentality of the crime. 

 On appeal, Appellant argues that the statement is inadmissible because he was not given his
Miranda or statutory warnings prior to making the statement regarding the gun's location. The State
concedes that Appellant was in custody when he made the statement but argues that no warnings are
required because the statement is admissible under Article 38.22, § 3(c). (3) Before addressing the
State's argument, we will examine the trial court's conclusion that Appellant was not subjected to
custodial interrogation, and therefore, there was no necessity that he be warned.

 In the hearing conducted outside the presence of the jury, the State established that the
polygraph examiner Crider interviewed Appellant in the presence of Rogers and Becker. The State
failed to offer any evidence regarding the nature of the questions put to Appellant by Crider or how
Crider broached the subject of the gun used to commit the offenses. Given that the record shows
Appellant made the statement in the course of an interview about the robberies and shooting and
there is no evidence that Appellant simply blurted out the information regarding the gun's location,
the State failed to prove that the statement was not the product of custodial interrogation. We will
next consider the State's argument that no warnings are necessary under Article 38.22, § 3(c), which
provides:

 Subsection (a) of this section (4) shall not apply to any statement which contains
assertions of facts or circumstances that are found to be true and which conduce to
establish the guilt of the accused, such as the finding of secreted or stolen property
or the instrument with which he states the offense was committed.


Tex.Code Crim.Proc.Ann. art. 38.22, § 3(c)(Vernon Pamph. 2003).

 Although Section 3(c) dispenses with the statutory warnings, Miranda warnings are still
required. See Robertson v. State, 871 S.W.2d 701, 714 (Tex.Crim.App. 1993); Braddock v. State,
5 S.W.3d 748, 753-54 (Tex.App.--Texarkana 1999, no pet.). Although Appellant had been
previously warned on April 22, the State presented no evidence that he was given Miranda warnings
more than a week later on May 4. Therefore, the evidence regarding Appellant's statement leading
to the discovery of the gun should not have been admitted at trial.

Harm Analysis


 The admission of Appellant's statement regarding the location of the weapon is a
constitutional error that requires a harm analysis. Mendez v. State, 56 S.W.3d 880, 893 (Tex.App.--Austin 2001, pet. ref'd), citing Evans v. State, 534 S.W.2d 707, 710-11 (Tex.Crim.App. 1976);
Muttoni v. State, 25 S.W.3d 300, 308 (Tex.App.--Austin 2000, no pet.). The appropriate standard
is that found in Tex.R.App.P. 44.2(a) which requires the appellate court to reverse unless it is
determined beyond a reasonable doubt that the error did not contribute to the conviction or
punishment. If there is a reasonable likelihood that the error materially affected the jury's
deliberations, then the error was not harmless beyond a reasonable doubt. Wesbrook v. State, 29
S.W.3d 103, 119 (Tex.Crim.App. 2000). We must be able to conclude from the record that the
erroneously admitted evidence was, in fact, harmless beyond a reasonable doubt. See id. An
appellate court should not focus on the propriety of the outcome of the trial. Id.; Garcia v. State, 919
S.W.2d 370, 380 (Tex.Crim.App. 1994). Instead, the appellate court should calculate as much as
possible the probable impact of the error on the jury in light of the existence of other evidence. 
Wesbrook, 29 S.W.3d at 119. While the most significant concern must be the error and its effects,
the presence of overwhelming evidence supporting the finding in question can be a factor in the
evaluation of harmless error. Id. If an appellate court rules that an error is harmless, it is in essence
asserting that the nature of the error is such that it could not have affected the jury. Id. A reviewing
court asks if there was a reasonable possibility that the error, either alone or in context, moved the
jury from a state of non-persuasion to one of persuasion as to the issue in question. Id.

 In addition to the evidence adduced through the State's witnesses, the jury had before it
Appellant's recorded statement admitting that he had threatened the Blacks with a gun during the
robbery and had shot Glidwell. The admission of Appellant's statement regarding the location of
the gun would have had little effect on the jury in light of all the other evidence demonstrating his
guilt of the aggravated robberies. Finding beyond a reasonable doubt that the error did not contribute
to Appellant's conviction or punishment, we overrule Issue Two. 

MISTRIAL


 In his third issue, Appellant argues that the trial court should not have received a "partial
verdict" but rather should have granted a mistrial as to the entire case when the jury could not reach
a unanimous verdict on Count I. According to Appellant, there is no specific authority for the trial
court's decision to receive the verdicts on Counts II and III and grant a mistrial on Count I.

 Two or more offenses may be joined in a single indictment, information, or complaint, with
each offense stated in a separate count, if the offenses arise out of the same criminal episode. 
Tex.Code Crim.Proc.Ann. art. 21.24(a)(Vernon 1989). The verdict in every criminal case must
be general. Tex.Code Crim.Proc.Ann. art. 37.07, § 1(a)(Vernon 1981). If an indictment contains
more than one count, the jury must return separate verdicts as to each count. Tex.Code
Crim.Proc.Ann. art. 37.07, § 1(c). When the jury has reached a unanimous verdict, the trial court
is mandated to enter the verdict on its minutes. Tex.Code Crim.Proc.Ann. art. 37.04 (Vernon
1981). (5)
 If a jury is unable to reach a unanimous verdict, however, the trial court may in its discretion
grant a mistrial and discharge the jury. Tex.Code Crim.Proc.Ann. art. 36.31; Jackson v. State, 17
S.W.3d 664, 676 (Tex.Crim.App. 2000).

 Here, the State properly joined the attempted capital murder and two robbery offenses in a
single indictment containing three counts pursuant to Article 21.24(a). In accordance with Article
37.07, § 1(c), the trial court required that the jury return separate general verdicts, guilty or not
guilty, as to each of the three counts. Appellant argues that the receipt of the two guilty verdicts
violates Article 37.07, § 1(a)'s requirement of a general verdict. We disagree. By separate general
verdicts, the jury unanimously found Appellant guilty of Counts II and III. The trial court's receipt
of those general verdicts does not violate Article 37.07, § 1(a). Given that the jury reached
unanimous verdicts as to Counts II and III, the trial court had no discretion to grant a mistrial as to
those two counts but rather was obligated to enter them on the minutes of the court. Issue Three is
overruled. 

PUNISHMENT EVIDENCE


 In his final issue, Appellant asserts that the trial court erred by admitting victim impact
testimony by James Glidwell at the punishment stage when a mistrial had been granted as to the
attempted capital murder count. The trial court permitted Glidwell to testify regarding the extent of
his permanent physical injuries, his inability to work, medical expenses, and the effect of the
shooting on his family and personal relationships and overall quality of life. 

Preservation of Error


 On appeal, Appellant argues that Glidwell's victim impact testimony is irrelevant and that
its probative value is substantially outweighed by the danger of unfair prejudice. At trial, however,
Appellant raised only a relevancy objection to the evidence. Therefore, our analysis will be limited
to the relevancy issue. See Tex.R.App.P. 33.1; Santellan v. State, 939 S.W.2d 155, 171
(Tex.Crim.App. 1997)(To preserve error for review on appeal, a defendant's complaint on appeal
must comport with the objection raised at trial).

Standard of Review


 A trial court has broad discretion in determining the admissibility of punishment evidence. 
See Davis v. State, 68 S.W.3d 273, 282 (Tex.App.--Dallas 2002, pet. ref'd); Moreno v. State, 1
S.W.3d 846, 861 (Tex.App.--Corpus Christi 1999, pet. ref'd). In non-capital felony cases, the State
may present evidence as to any matter the trial court deems relevant to sentencing, including
evidence of other crimes or bad acts. See Tex.Code Crim.Proc. Ann. art. 37.07, § 3(a)(1)(Vernon
Supp. 2003); Davis, 68 S.W.3d at 282; Tracy v. State, 14 S.W.3d 820, 825 (Tex.App.--Dallas 2000,
pet. ref'd). At the punishment hearing, relevant evidence is that which assists the fact finder in
assessing the appropriate sentence under the circumstances. See Rogers v. State, 991 S.W.2d 263,
265 (Tex.Crim.App. 1999); Davis, 68 S.W.3d at 282-83. The relevancy of victim impact evidence
depends on whether it has "some bearing on the defendant's 'personal responsibility and moral
guilt.'" Stavinoha v. State, 808 S.W.2d 76, 79 (Tex.Crim.App. 1991). Once found guilty, a
defendant's moral culpability includes both the results of the offense actually intended and the results
that should have been anticipated. See Miller-El v. State, 782 S.W.2d 892, 897 (Tex.Crim.App.
1990). Victim impact testimony concerning the effect the offense had on the victim or the victim's
family is generally relevant. See Richardson v. State, 83 S.W.3d 332, 360 (Tex.App.--Corpus Christi
2002, pet. ref'd)(evidence regarding effect of crime on victim's children); Moreno v. State, 38
S.W.3d 774, 778 (Tex.App.--Houston [14th Dist.] 2001, no pet.)(grandmother's testimony of
psychological impact crime had on members of deceased's extended family, including suicide of
deceased's uncle); We will not disturb a trial court's determination regarding the admissibility of
victim impact evidence unless an abuse of discretion has been shown. See Mosley v. State, 983
S.W.2d 249, 262 (Tex.Crim.App. 1998).

 In Cantu v. State, 939 S.W.2d 627 (Tex.Crim.App. 1997), the Court of Criminal Appeals
addressed the admissibility of victim impact evidence pertaining to a murder victim not named in
the indictment. The evidence showed that Appellant, along with other actors, brutally raped and
murdered Jennifer Ertman and Elizabeth Pena during the course of the same criminal episode. 
Cantu, 939 S.W.2d at 631-32. A jury convicted Appellant of the capital murder of Ertman. Id. at
631. The charge pertaining to Pena's murder was not included in the indictment. During the
punishment phase of trial, the State offered victim impact testimony through Pena's mother. Id. at
635. She described for the jury what her daughter had been like in life and described the impact of
her death on the family. Id. The Court of Criminal Appeals held that "extraneous" victim impact
evidence pertaining to a victim not named in the indictment is irrelevant under Rule 401. Id. at 637. 
Further, the danger of unfair prejudice with respect to a victim not named in the indictment is
unacceptably high. Id. The Court, however, did not reverse Cantu's conviction because it found the
evidence harmless under the circumstances of the case. Id. at 637-38.

 At first blush, the instant case appears to be distinguishable from Cantu in that the attempted
capital murder charge was included in the same indictment as the two aggravated robberies. But this
is a distinction without a difference. Even though the attempted capital murder charge pertaining
to Glidwell was included in the indictment, the jury was unable to unanimously conclude that
Appellant was personally and morally culpable for the intended and foreseeable results of Glidwell's
shooting. Because Appellant has not been found guilty of attempted capital murder, the trial court
abused its discretion in admitting this victim impact evidence.

 As a general rule, error in the admission or exclusion of evidence does not rise to a
constitutional level. Arzaga v. State, 86 S.W.3d 767, 776 (Tex.App.--El Paso 2002, no pet.). 
Therefore, we apply the harmless error standard found in Tex.R.App.P. 44.2(b). Under this rule, the
erroneous admission of evidence warrants reversal only if the evidence had a substantial and
injurious effect or influence in determining the jury's verdict. See Morales v. State, 32 S.W.3d 862,
867 (Tex.Crim.App. 2000); King v. State, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997). If the error
had no influence or only a slight influence on the verdict, it is harmless. Johnson v. State, 967
S.W.2d 410, 417 (Tex.Crim.App. 1998). However, if the reviewing court harbors "grave doubts"
that an error did not affect the outcome, that court must treat the error as if it did. United States v.
Lane, 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986); Webb v. State, 36 S.W.3d 164,
182-83 (Tex.App.--Houston [14th Dist.] 2000, pet. ref'd). The United States Supreme Court has
defined "grave doubt" to mean "in the judge's mind, the matter is so evenly balanced that he feels
himself in virtual equipoise as to the harmlessness of the error." O'Neal v. McAninch, 513 U.S. 432,
435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). If the reviewing court is unsure whether the error
affected the outcome, the court should treat the error as harmful, i.e., as having a substantial and
injurious effect or influence in determining the jury's verdict. Id. In assessing the likelihood that
the error adversely affected the jury's decision, we consider everything in the record, including all
testimony and evidence admitted for the jury's consideration, the nature of the evidence supporting
the verdict, the character of the alleged error, and how the error might have been considered in
connection with other evidence in the case. See Morales, 32 S.W.3d at 867. We may also consider
the State's theory of the case, any defensive theories, closing arguments, and voir dire. See Morales,
32 S.W.3d at 867; Arzaga, 86 S.W.3d at 776.

 The jury properly had before it all of the evidence adduced during guilt-innocence. (6) That
evidence showed that Appellant committed a pre-meditated and armed robbery of the Blacks. 
During the course of the robbery, Appellant terrorized the Blacks and threatened to sexually assault
Sheila Black in front of her husband. During his immediate flight from the robbery and subsequent
efforts to elude the police over the next few days, Appellant endangered the lives of both law
enforcement officers and citizens. The evidence also showed that Appellant had previously been
convicted of possession of methamphetamine, aggravated robbery with a firearm, and arson. 
Additionally, Appellant admitted during his punishment phase testimony that he had stolen the truck
he used in the instant offenses. He had also committed the theft of several saddles and two utility
trailers. When asked whether he had learned anything from his prior aggravated robbery conviction,
Appellant conceded that he had not. The victim impact testimony was not limited to that offered by
Glidwell. Mrs. Black testified that as a result of the offense, she and her husband had moved to a
new home. The Blacks had become fearful and afraid to go out alone. They no longer listed their
telephone number and did not permit strangers to come into their home. Due to the stress, Mr. Black
developed a bleeding ulcer which had required significant medical treatment.

 The punishment evidence and the prosecutor's final argument focused extensively on the
facts pertaining to the aggravated robberies and Appellant's prior criminal history and unadjudicated
bad acts. Understandably, the State paid particular attention to the prior aggravated robbery
conviction and Appellant's admission that he had not learned anything from his prior conviction and
imprisonment for that offense. Although the prosecutor made a brief reference to Glidwell's victim
impact testimony during final argument, the jury was urged to assess a maximum sentence based
upon the facts of the aggravated robbery cases and Appellant's criminal record. Under these
circumstances, we are unable to conclude that the erroneous admission of the victim impact evidence
had a substantial and injurious impact on the jury's punishment verdict. Accordingly, Issue Four is
overruled. The judgment of the trial court is affirmed.


November 6, 2003 

 ANN CRAWFORD McCLURE, Justice


Before Panel No. 1

Larsen, McClure, and Chew, JJ.


(Do Not Publish)
1. Miranda v. Arizona
, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
2. During his original statement, Appellant had repeatedly insisted that he would take a polygraph examination
regarding his account of the robberies and shooting.
3. Tex.Code Crim.Proc.Ann. art. 38.22 (Vernon Pamph. 2003).
4. Among other things, Article 38.22, § 3(a) provides that an oral statement is not admissible unless the warnings
required by Article 38.22, § 2(a) are provided to the accused. Tex.Code Crim.Proc.Ann. art. 38.22, § 3(a)(Vernon
Pamph. 2003).
5. Article 37.04 provides: "When the jury agrees upon a verdict, it shall be brought into court by the proper
officer; and if it states that it has agreed, the verdict shall be read aloud by the judge, the foreman, or the clerk. If in
proper form and no juror dissents therefrom, and neither party requests a poll of the jury, the verdict shall be entered
upon the minutes of the court."

6. Even if the State had not charged Appellant with attempted capital murder in the indictment, the evidence
pertaining to Glidwell's shooting would have been admissible as same transaction contextual evidence. See generally
Camacho v. State, 864 S.W.2d 524, 532 (Tex.Crim.App. 1993); Rogers v. State, 853 S.W.2d 29, 33 (Tex.Crim.App.
1993); Mayes v. State, 816 S.W.2d 79, 84-87 (Tex.Crim.App. 1991). Such evidence imparts to the trier of fact
information essential to understand the context and circumstances of events which, although legally separate offenses,
are factually blended or interwoven. Camacho, 864 S.W.2d at 532.