# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-05-00585-CR
NO. 03-05-00586-CR

**Ex parte James W. Ellis**

NO. 03-05-00589-CR
NO. 03-05-00590-CR
NO. 03-05-00591-CR
NO. 03-05-00592-CR
NO. 03-05-00593-CR
NO. 03-05-00594-CR
NO. 03-05-00595-CR
NO. 03-05-00596-CR
NO. 03-05-00597-CR
NO. 03-05-00598-CR
NO. 03-05-00599-CR
NO. 03-05-00600-CR
NO. 03-05-00601-CR
NO. 03-05-00602-CR
NO. 03-05-00603-CR

**Ex parte John Dominick Colyandro**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
NOS. D-1-DC-2005-904122, 9040564, 9040570, 9040571, 9040572, 9040573, 9040574,
9040575, 9040576, 9040577, 9040565, 9040566, 9040567, 9040568, 9040569,
9040598 & D1DC-05-904121
HONORABLE BOB PERKINS, JUDGE PRESIDING**

**O P I N I O N**

In these pretrial proceedings, James W. Ellis and John Dominick Colyandro seek the dismissal of indictments accusing them of accepting unlawful campaign contributions and money laundering. They argue that the election code provisions under which they have been indicted are unconstitutionally vague and overbroad, and that the money laundering statute in effect at the time of the alleged offense is unconstitutionally vague. The trial court denied relief and these appeals followed. We affirm the orders of the district court.

**The Indictments**

Ellis and Colyandro were first indicted in September 2004 on charges of unlawful acceptance of corporate political contributions (Colyandro only) and money laundering (Ellis and Colyandro). Collectively, the indictments accuse Ellis and Colyandro of participating in a scheme to channel unlawful corporate political contributions to candidates for the Texas House of Representatives in 2002 in violation of the Texas Election Code. Thirteen of the indictments pending against Colyandro allege that on various dates throughout 2002, Colyandro knowingly accepted political contributions from certain business corporations to a political committee called Texans for a Republican Majority PAC (TRMPAC) that Colyandro knew to have been made in violation of the election code. *See* Tex. Elec. Code Ann. § 253.003 (West 2003); *see also id*. § 253.094 (West 2003). The remaining indictments alleged that on or about September 13, 2002, Ellis and Colyandro knowingly conducted and facilitated a transaction involving the proceeds of activity that violated section 253.094 of the election code, and that the value of the funds was

2

$100,000 or more. *See* Act of May 26, 1993, 73d Leg., R.S., ch. 761, § 2, 1993 Tex. Gen. Laws 2966, 2967 (amended 2005) (current version at Tex. Penal Code Ann. § 34.02 (West Supp. 2008)) (money laundering);[1] Tex. Elec. Code Ann. § 253.094 (prohibited contributions). The indictments state that six named corporations gave unlawful contributions totaling $155,000 to TRMPAC, that Ellis and Colyandro delivered these corporate contributions to the Republican National State Elections Committee in the form of a check for $190,000 drawn on a TRMPAC account and signed by Colyandro, and that the national committee then made contributions totaling $190,000 to a list of Texas house candidates suggested by Ellis. The $190,000 check to the Republican National State Elections Committee was expressly made part of and reproduced in the September 2004 money laundering indictments.

Ellis and Colyandro were reindicted in July 2005. The new indictments alleged that Ellis and Colyandro knowingly facilitated a transaction involving the proceeds of activity violating sections 253.003 and 253.094 of the election code, and that the value of the funds was $100,000 or more. *See* Tex. Elec. Code Ann. § 253.003 (unlawfully making or accepting contribution) and Act of May 26, 1993, 73d Leg., R.S., ch. 761, § 2, 1993 Tex. Gen. Laws 2966, 2967 (amended 2005) (current version at Tex. Penal Code Ann. § 34.02) (money laundering). The allegations in the new indictments are essentially the same as those contained in the first set of indictments with the exception that the new indictments do not allege that the transfer of $190,000 from TRMPAC to the national committee was made by check and do not incorporate the check as

---

[1] These prosecutions are governed by the money laundering statutes in effect in 2002. Unless otherwise indicated, citations to chapter 34 of the Texas Penal Code are to the version of the statutes in effect in 2002.

part of the indictments. The original indictments were not dismissed, and both sets of indictments are pending.

Ellis and Colyandro petitioned the district court for a writ of habeas corpus, seeking dismissal of the original prosecutions on the basis that election code section 253.094 is unconstitutionally vague and overbroad. *See Ex parte Weise*, 55 S.W.3d 617, 620 (Tex. Crim. App. 2001) (criminal defendant may use pretrial habeas corpus to challenge facial constitutionality of statute he is accused of violating); *Ex parte Mattox*, 683 S.W.2d 93, 96 (Tex. App.—Austin 1984), *aff'd*, 685 S.W.2d 53 (Tex. Crim. App. 1985) (same). After they were reindicted, Ellis and Colyandro filed additional habeas corpus petitions, seeking dismissal of the new prosecutions on the basis that election code sections 253.003 and 253.094 are unconstitutionally vague and overbroad, and that the money laundering statute under which they were indicted is unconstitutionally vague. The district court denied relief.

**Election Code Provisions**

Ellis and Colyandro seek dismissal of both sets of indictments arguing that sections 253.003 and 253.094 of the election code are unconstitutionally vague and overbroad on their face.[2] They argue that these sections are vague and overbroad because the statutory definition of "campaign contribution" is "insufficiently tailored and precise to avoid criminalizing protected conduct or chilling the exercise of First Amendment rights." More specifically, Ellis and Colyandro

---

[2] Because of the procedural posture of this case as a pretrial habeas corpus proceeding, Ellis and Colyandro do not bring an "as applied" challenge. Consequently, we express no opinion with respect to the viability or resolution of an "as applied" challenge.

4

point to the portion of the definition of "campaign contribution" providing that the contribution be "offered or given with the intent that it be used in connection with a campaign" as too imprecise to give constitutionally adequate notice of what conduct is prohibited as well as criminalizing conduct that comes within the protections of the First Amendment right to free speech.

It is a fundamental constitutional principle that an enactment is void for vagueness if its prohibitions are not clearly defined. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A criminal law must be sufficiently clear in at least three respects: (1) a person of ordinary intelligence must be given a reasonable opportunity to know what is prohibited; (2) the law must establish determinate guidelines for law enforcement; and (3) where First Amendment freedoms are implicated, the law must be sufficiently definite to avoid chilling protected expression. *Id.* at 108-09; *Long v. State*, 931 S.W.2d 285, 287 (Tex. Crim. App. 1996). When a vagueness challenge involves First Amendment considerations, a criminal law may be held facially invalid even though it may not be unconstitutional as applied to the defendant's conduct. *Long*, 931 S.W.2d at 288. Ellis and Colyandro argue that the election code provisions relating to corporate campaign contributions run afoul of all three requirements because of the indefiniteness inherent in the prohibition of contributions that are "given with the intent" that they be used "in connection with a campaign."

To place Ellis and Colyandro's complaints in context, some background is necessary as to how the rather complicated Texas Election Code structure attempts to regulate political contributions. Chapter 253 of the election code regulates political contributions and expenditures in Texas. It is an offense for a person to "knowingly make a political contribution in violation of this chapter" or to "knowingly accept a political contribution the person knows to have been made

in violation of this chapter." Tex. Elec. Code Ann. § 253.003(a), (b). Ellis and Colyandro are accused of accepting unlawful corporate campaign contributions made in violation of election code sections 253.003 and 253.094.

Subchapter D of chapter 253 governs political contributions and expenditures by corporations and labor organizations. "A corporation or labor organization may not make a political contribution or political expenditure that is not authorized by this subchapter." *Id.* § 253.094(a). Subchapter D specifically authorizes a corporation to "make campaign contributions from its own property in connection with an election on a measure only to a political committee for supporting or opposing measures exclusively,"[3] *id.* § 253.096 (West 2003), and "to finance the establishment or administration of a general-purpose committee" or "to finance the solicitation of political contributions to a general-purpose committee"[4] from the corporation's stockholders, employees,

---

[3] A "measure" is "a question or proposal submitted in an election for an expression of the voters' will and includes the circulation and submission of a petition to determine whether a question or proposal is required to be submitted in an election for an expression of voters' will." Tex. Elec. Code Ann. § 251.001(19) (West Supp. 2008).

[4] A "general-purpose committee" is a political committee that has among its principal purposes:

(A) supporting or opposing:

(i) two or more candidates who are unidentified or are seeking offices that are unknown; or

(ii) one or more measures that are unidentified; or

(B) assisting two or more officeholders who are unidentified.

*Id.* § 251.001(14). A "political committee" is "a group of persons that has as a principal purpose accepting political contributions or making political expenditures." *Id.* § 251.001(12).

or families, *id.* § 253.100(a), (b) (West Supp. 2008). Other political contributions or political expenditures specifically authorized by subchapter D include: direct expenditures "in connection with an election on a measure," *id.* § 253.097 (West 2003), direct expenditures "for the purpose of communicating directly with [the corporation's] stockholders or members," *id.* § 253.098 (West 2003), and "expenditures to finance nonpartisan voter registration and get-out-the-vote campaigns aimed at its stockholders or members," *id.* § 253.099 (West 2003). Thus, with the exception of the enumerated types of contributions and expenditures expressly authorized, all other "campaign contributions" and "expenditures" by corporations are prohibited. Although the election code sets out distinctions between authorized and unauthorized (i.e., criminal) contributions, Ellis and Colyandro contend that the provisions are too vague for "a person of ordinary intelligence" to determine what conduct is authorized and what conduct is prohibited. Ellis and Colyandro also argue that the statutory definitions of unauthorized conduct are unconstitutionally overbroad because they necessarily prohibit a substantial amount of constitutionally protected conduct in all applications.

Ellis and Colyandro's argument that section 253.094—and by extension, section 253.003—is unconstitutionally vague and overbroad focuses on the definitions of "political contribution" and "campaign contribution."[5] The election code defines "political contribution" as

---

[5] Although Ellis and Colyandro assert that sections 253.003 and 253.094 are both unconstitutionally vague and overbroad on their face, their challenge to section 253.003 derives from their challenge to section 253.094. They contend that because section 253.094 is vague and overbroad, a person accepting a corporate contribution on behalf of a political committee cannot reasonably be expected to know whether the contribution is lawful. Our analysis will, therefore, focus on Ellis and Colyandro's challenge to section 253.094.

7

"a campaign contribution or an officeholder contribution." *Id.* § 251.001(5) (West Supp. 2008). A "campaign contribution" is "a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure." *Id.* § 251.001(3). Under the statutory structure, a "campaign contribution" is a type of "political contribution," but the parties agree that, for purposes of this case, the two terms are effectively interchangeable.[6]

A "contribution," in turn, is defined as "a direct or indirect transfer of money, goods, services, or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a transfer." *Id.* § 251.001(2).[7] As a corollary, an

---

[6] Political contributions include campaign contributions and officeholder contributions. *Id*. § 251.001(5). An "officeholder contribution" is a contribution to an officeholder or political committee intended to defray expenses incurred by the officeholder in performing the duties or activities of the office. *Id*. § 251.001(4). There is no suggestion in the record or the briefs that the alleged political contributions in this case were officeholder contributions.

[7] The definition of "contribution" reads in full:

a direct or indirect transfer of money, goods, services, or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a transfer. The term includes a loan or extension of credit, other than those expressly excluded by this subdivision, and a guarantee of a loan or extension of credit, including a loan described by this subdivision. The term does not include:

> (A) a loan made in the due course of business by a corporation that is legally engaged in the business of lending money and that has conducted the business continuously for more than one year before the loan is made; or

> (B) an expenditure required to be reported under Section 305.006(b), Government Code.

*Id.* § 251.001(2).

8

"expenditure" is "a payment of money or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a payment." *Id.* § 251.001(6). Similar to the statutory structure for contributions, a "political expenditure" is defined as either a "campaign expenditure" or "officeholder expenditure," with a "campaign expenditure" further defined as "an expenditure made by any person in connection with a campaign for an elective office or on a measure." *Id.* § 251.001(7), (10). Thus, both campaign contributions and campaign expenditures are characterized by a payment or transfer of money or other thing of value with campaign contributions being distinguished by (1) the nature of the recipient (a candidate or political committee, as opposed to someone else[8]), and (2) the contributor's intent that the recipient of the contribution *use* it in connection with an election (as opposed to its simply being made "in connection with an election"). The definitions of campaign expenditure and campaign contribution overlap to an extent, as indicated by the election code's definition of a "direct campaign expenditure" as a "campaign expenditure that does not constitute a campaign contribution by the person making the expenditure." *Id.* § 251.001(8).

As these myriad definitions suggest, whether a payment or transfer of anything of value falls within the prohibitions of the election code turns largely on the meaning of the phrase "in connection with a campaign for elective office." An expenditure that is made "in connection with" a campaign is a regulated "campaign expenditure;" otherwise, it is not regulated. Similarly, if an expenditure can be construed as a direct or indirect transfer of a thing of value to a candidate

---

[8] An expenditure, including one for political speech, will necessarily be made to *some* third party. *See Buckley v. Valeo*, 424 U.S. 1, 19 (1976) ("[V]irtually every means of communicating ideas in today's mass society requires the expenditure of money.").

9

or political committee with the intent that it be used "in connection with" a campaign, it is a regulated "campaign contribution." Conversely, as the State acknowledges, a payment or transfer to a candidate or political committee is not a "political contribution"—and therefore, not regulated by the election code at all—if it is not "offered or given with the intent that it be used in connection with a campaign for elective office or on a measure." This statutory demarcation of what constitutes acceptable as opposed to criminal conduct with respect to giving money to organizations that engage in the political process—relying as it does on a contributor's intent and on the troublesome phrase "in connection with" a campaign—is the primary focus of Ellis and Colyandro's overbreadth and vagueness challenges.

As Ellis and Colyandro observe, a "political committee" is defined as "a group of persons that has as *a* principal purpose accepting political contributions or making political expenditures." *Id.* § 251.001(12) (emphasis added). The legislature contemplated that an entity constituting a political committee may have one or more principal purposes other than accepting political contributions and making political expenditures. *See id.* § 251.001(13) ("specific-purpose committee . . . does have *among* its principal purpose*s* . . . ."), (14) ("general-purpose committee . . . has *among* its principal purpose*s* . . . .") (emphases added). Consistent with this statutory language, the Texas Ethics Commission has recognized that an entity constituting a political committee may have purposes or activities other than those subjecting it to regulation under Title 15 of the election code. *See* Op. Tex. Ethics Comm'n No. 131 (1993) ("Title 15 . . . regulates a political committee's activities that have to do with accepting political contributions and making political expenditures. It does not regulate other activities of political committees."); Op. Tex. Ethics

10

Comm'n No. 200 (1994) (same); Op. Tex. Ethics Comm'n No. 168 (1993) ("[A] general-purpose committee may have other purposes besides accepting political contributions and making political expenditures."). Therefore, not all contributions to or expenditures by a political committee are regulated by the election code. Examples include contributions to political committees to "be used to hire lobbyists to influence legislators in regard to legislation" and grassroots advocacy "to supporters suggesting they write legislators," *id.* No. 131; contributions for use in "forums" (if not "given with the intent that they be used to support or oppose a candidate for election to a public office"), *id.* No. 168; contributions for use in conducting a seminar to educate women "on the topic of developing positive influencing skills," *id.* No. 200; contributions to fund a scholarship (as long as the committee's expenditures in connection with the scholarship fund are not made in connection with a campaign for elective office or a measure or for officeholder purposes), *id.* No. 409 (1998); or contributions to cover a lobbyist's own travel, food, and lodging in attending a political fundraiser golf tournament, *id.* No. 467 (2006).

Emphasizing this aspect of the statutory scheme, Ellis and Colyandro argue that where an entity or association constituting a political committee also engages in lobbying, grassroots advocacy, or expressing its views on general issues of policy or public concern, such activities could easily be characterized as "in connection with" a campaign whenever they bear some resemblance to issues arising in a candidate's campaign—whether the resemblance is intentional or purely coincidental. In such a context, Ellis and Colyandro argue, the line between an unregulated payment to a political committee and a regulated "contribution . . . that is offered or given with the intent that it be used in connection with a campaign for elective office" fails to give potential contributors and potential "acceptors" constitutionally adequate notice of the conduct prohibited and gives law

11

enforcement officers no clear guidelines for enforcing the election laws. This potential difficulty

with knowing whether specific conduct will have criminal implications under the election code, Ellis

and Colyandro maintain, chills constitutionally protected expression and necessarily brings within

the coverage of the election code's criminal provisions a substantial amount of expressive activity

protected by the First Amendment.

### *Buckley v. Valeo* and Progeny

In support of their facial challenge to the Texas restriction on corporate campaign

contributions, Ellis and Colyandro point to parallels in First Amendment jurisprudence regarding

regulation of campaign expenditures. In *Buckley v. Valeo*, the United States Supreme Court

considered constitutional challenges to various provisions of the Federal Election Campaign Act of

1971 (FECA), including a ceiling on campaign expenditures by individuals and groups "relative to

a clearly identified candidate." 424 U.S. 1, 39 (1976). Although recognizing various government

interests in regulating campaign finance, the Court emphasized that "[c]lose examination of the

specificity of the statutory language is required where, as here, the legislation imposes criminal

penalties in an area permeated by First Amendment interests." *Id.* at 40-41.[9] Concluding that "[t]he

---

[9] Ellis and Colyandro correctly point out that limits on political contributions and expenditures "operate in an area of the most fundamental First Amendment activities." *See Buckley*, 424 U.S. at 14. As explained in *Buckley*:

> Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people."

*Id.* (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

use of so indefinite a phrase as 'relative to' a candidate fails to clearly mark the boundary between permissible and impermissible speech," the Court construed the phrase in context with other provisions to "permit, if indeed . . . not require, [it] to be read to mean 'advocating the election or defeat of' a candidate." *Id.* at 41-42. However, the Court reasoned, merely tying "relative to" to "advocating the election or defeat of a candidate" did not eliminate the vagueness problem:

> For the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest. In an analogous context, this Court in *Thomas v. Collins*, 323 U.S. 516 (1945), observed:
>
> > '[W]hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.
> >
> > 'Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim.'
>
> *Id.* at 535.

424 U.S. at 42-43. To address constitutional vagueness concerns, the Court held that the statute "must be construed to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate." *Id.* at 43-44. Such "express terms" would

13

include, the court suggested, those such as "'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id.* at 44 n.52.[10]

The United States Supreme Court has continued to adhere to this "express advocacy" doctrine, construing similar regulations of campaign expenditures to apply only to the types of "explicit terms" noted in *Buckley* in an effort to articulate a discernible and enforceable line between permissible regulation of speech versus protected issue advocacy unrelated to (or only tangentially related to) the election or defeat of a specific candidate. The Court reaffirmed the "express advocacy" doctrine in its latest pronouncement on the subject of First Amendment protection of political speech in *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652, 2665 (2007).

The Texas Supreme Court has also applied the express advocacy doctrine in upholding the election code's reporting requirements for direct campaign expenditures under a construction that limits their application only to the type of express advocacy outlined in *Buckley*.

---

[10] The Court applied a similar analysis to a disclosure requirement applicable to individual independent expenditures "for the purpose of . . . influencing" the nomination or election of federal candidates. *Buckley*, 424 U.S. at 77. "It is the ambiguity of this phrase," the Court explained, "that causes constitutional problems." *Id.* at 78. The Court emphasized again that vagueness problems are "particularly treacherous where . . . the violation . . . carries criminal penalties, and fear of incurring these sanctions may deter those who seek to exercise protected First Amendment rights." *Id.* at 76-77. To ensure that the reach of the disclosure requirement in that context was not impermissibly broad, the Court employed the same limiting construction it had used earlier: "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80. "This reading is directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate." *Id.* So limited, the Court held that the reporting requirement "bears a sufficient relationship to a substantial government interest." *Id.*

14

*Osterberg v. Peca*, 12 S.W.3d 31, 35 (Tex. 2000); *see* Tex. Elec. Code Ann. § 253.062(a)(1) (West 2003). Citing *Buckley*, the Texas Supreme Court held that the election code's definition of "campaign expenditure" as an expenditure "in connection with a campaign for elective office" was unconstitutionally vague for the same reasons that the phrase "relative to a clearly identified candidate" was found problematic in *Buckley*. *Osterberg*, 12 S.W.3d at 51; *see* Tex. Elec. Code Ann. § 251.001(7). The Court wrote, "Applied to an individual making expenditures, the Texas Election Code is vulnerable to the same constitutional attacks that *Buckley*'s narrowing construction avoided." *Osterberg*, 12 S.W.3d at 51. To avoid "constitutional infirmities," the Texas Supreme Court followed the *Buckley* court's approach and held that "a 'direct campaign expenditure' by an individual in a candidate election includes only those expenditures that 'expressly advocate' the election or defeat of an identified candidate." *Osterberg*, 12 S.W.3d at 51.

Ellis and Colyandro assert that the phrase "in connection with a campaign for elective office" in the election code's definition of "campaign contribution" is even less precise than the phrase "relative to a clearly identified candidate" found wanting in *Buckley* with respect to political expenditures, and equally as problematic as the exact same language found wanting in *Osterberg* with respect to campaign expenditures. Ellis and Colyandro argue that, at a minimum, we must apply the "express advocacy" limiting construction of *Buckley* and *Osterberg* to the election code's definition of "campaign contribution" to address the potential chilling of pure issue advocacy, lobbying, or other protected speech unrelated to candidates that is expressed by contributing to entities that participate in the political process and either are or may constitute political committees. In other words, Ellis and Colyandro argue that "campaign contribution" under the election code

15

must be construed, at least with regard to contributions to political committees, as a contribution that is offered or given with the intent that it be used for communications that in express terms advocate the election or defeat of a clearly identified candidate (e.g., "vote for," "elect," "support," etc.). As a necessary corollary, the limitation would also define the scope of what is prohibited as a corporate campaign contribution under section 253.094.

Ellis and Colyandro then posit that, while the reporting requirements upheld in *Osterberg* could be saved with the overlay of an "express advocacy" limiting construction, the campaign contribution prohibition of section 253.094 cannot be saved in a similar way because it involves criminal penalties that strike at core First Amendment rights. Even with an "express advocacy" limiting construction applied to the statute, Ellis and Colyandro argue, it is too vague to avoid chilling a substantial amount of constitutionally protected speech because of the severity of the consequences if it turns out the contributor is wrong in his calculation of whether a fact finder will conclude that the contribution was made with the intention that it be used to expressly advocate the election or defeat of a candidate.

**Corporate First Amendment Rights**

The State counters that the election code's restrictions on corporate campaign contributions and expenditures do not implicate *any* First Amendment interests—and we should apply only a "rational basis" test in our constitutional review as opposed to a higher standard of scrutiny—because "corporations have no constitutional rights independent of the rights of the individuals who comprise them." However, this is inconsistent with the controlling decisions of the United States Supreme Court with respect to the constitutional rights of corporations. *See, e.g.,*

16

*Austin v. Michigan State Chamber of Commerce*, 494 U.S. 652, 657 (1990) (applying strict scrutiny when analyzing Michigan ban on corporate independent expenditures in candidate elections; "[t]he mere fact that the Chamber is a corporation does not remove its speech from the ambit of the First Amendment."); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777-84 (1978) (acknowledging "a corporation's right to speak on issues of general public interest" and invalidating restriction on corporate contributions in constitutional amendment election); *see also Santa Clara County v. Southern Pac. R.R. Co.*, 118 U.S. 394 (1886) (Privileges and Immunities clause extends to corporations). The United States Supreme Court has recognized that corporations enjoy First Amendment free speech protections. In *Bellotti*, for example, the court struck down a Massachusetts statute under a strict scrutiny analysis that prohibited corporations from making expenditures in a referendum election unless they could prove a material effect on their businesses or property. The Court noted:

> [T]here is practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs. If the speakers here were not corporations, no one would suggest that the State could silence their proposed speech. It is the type of speech indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual. The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual.

*Bellotti*, 435 U.S. at 776-77 (internal citations and quotations omitted); *see Citizens Against Rent Control/Coal. For Fair Housing v. City of Berkeley*, 454 U.S. 290, 296-97 (1981) (invalidating limits on corporate contributions to political committee established to oppose ballot measures); *see also California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972)

(acknowledging corporations' First Amendment right to petition legislative and administrative bodies); *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137-38 (1961) (same). In addition, to prevent potential chilling of protected expressive activity, the court has applied the express advocacy limiting construction of *Buckley* to statutes regulating direct campaign expenditures by corporations. *See Wisconsin Right to Life*, 127 S. Ct. at 2666-67; *Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 248-49 (1986) (applying express advocacy doctrine to regulation of corporate independent expenditures "in connection with" any federal election). This same analysis has been applied by the Texas Ethics Commission to the prohibition against corporate political *expenditures* in section 294.094. Op. Tex. Ethics Comm'n No. 198 (1994); *see Osterberg*, 12 S.W.3d at 51 (placing "great weight" on Texas Ethics Commission Opinion No. 198).

**Contributions v. Expenditures**

The State also asserts that even if corporations possess First Amendment rights, the election code's prohibitions against corporate campaign contributions are nonetheless justified by legitimate, if not compelling, state interests and are neither unconstitutionally vague nor overbroad. The State correctly observes that the United States Supreme Court has viewed statutes regulating campaign *contributions* to implicate lesser First Amendment interests than those of campaign expenditures. The Court has viewed limitations on expenditures as tantamount to a direct restraint on speech[11] and as endangering the ability of groups "from effectively amplifying the voice of

---

[11] As the Court explained in *Buckley*:

18

their adherents, the original basis for the recognition of First Amendment protection of the freedom of association." *Buckley*, 424 U.S. at 19-22. Therefore, the Court has analyzed restrictions on expenditures under strict scrutiny. *Id.* at 44-45 ("[T]he constitutionality of [a restriction on expenditures] turns on whether the governmental interests advanced in support satisfy the exacting scrutiny applicable to the limitations on core First Amendment rights of political expression."). In contrast, the Court has viewed limitations on contributions as lesser impositions on speech and associational rights, and has applied a lower level of scrutiny to statutes implementing limitations on contributions. *Id.* at 20-27.

In *Buckley*, the United States Supreme Court held that the phrase "relative to a clearly identified candidate" was unconstitutionally vague with respect to expenditures.[12] The *Buckley*

---

> A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech.

424 U.S. at 19.

[12] The plaintiffs in *Buckley* also challenged the constitutionality of corresponding limitations on campaign contributions. Addressing the constitutionality of these provisions placing restrictions on campaign contributions, the Court found "a constitutionally sufficient justification" in "the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office." *Id.* at 25-27. The Court stated that restrictions on contributions can "serve the basic governmental interest in safeguarding the integrity of the electoral process without directly impinging upon the rights of individual citizens and candidates to engage in political debate and discussion." *Id.* at 23, 58.

19

court's discussion of First Amendment free speech issues with regard to campaign expenditures is instructive as to why the vagueness argument does not apply—under the Court's currently accepted jurisprudence—with equal force to campaign contributions. According to the Court, the language at issue—"relative to a clearly identified candidate"—was vague because there was nothing else in the statute clarifying what expenditures are "relative to" a candidate and the use of such an "indefinite" phrase "fails to clearly mark the boundary between permissible and impermissible speech." *Id.* at 41. This is so because the limits on political expenditures "place substantial and direct restrictions on the ability of" the speakers themselves to express their political views—"the ability of candidates, citizens, and associations to engage in protected political expression, restrictions that the First Amendment cannot tolerate." *Id.* at 58-59. On the other hand, according to the *Buckley* court, a limitation on campaign contributions involves little direct restraint on speakers or on persons and entities that ultimately turn contributions into a published message. *Id.* at 20-21. With regard to campaign contributions, the Court wrote:

> By contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues. While contributions may result in political expression if spent

20

by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor.

*Id.* Therefore, under the Court's current rationale, a potential campaign contributor need not determine whether the manner in which his funds are spent is constitutionally permissible. The contributor need not determine, for example, whether an expenditure on an advertisement expressly advocates the election or defeat of a candidate. The contributor gives funds, and the funds are transformed into political expression by someone else. It is the person making the expenditures or transforming the contributed funds into speech, not the contributor, who must be concerned with the vagueness of restrictions on the use of the funds. The concerns of the Court set out in *Thomas v. Collins*, 323 U.S. 516, 535 (1945), and quoted in *Buckley* as to speakers "hedging and trimming" their speech due to potential and unknown liability do not—under the Court's precedent—apply with the same force to the contributor, who is not directly involved in transforming funds into political speech.[13]

---

[13] Under the Court's current jurisprudence, the political expression involved in making a contribution to someone or something the contributor wishes to promote does not garner the same weight in the analysis as the political expression involved in using the contribution to actually accomplish the promotion of a message or cause. This has been the subject of a fair amount of criticism by both dissenting justices on the Court and commentators. One could argue that the "hedging and trimming" by a contributor will be in the form of declining to give a contribution at all (or anything that could be construed as a contribution) in order to avoid potential criminal liability and, thus, some amount of protected speech is reduced that would be generated by or supported by the contribution. However, a majority of the United States Supreme Court has not viewed this sort of burden on speech to be as significant from a constitutional perspective as the chilling of speech by a person or entity ultimately responsible for the publication of whatever speech is being supported by the contribution—i.e., the person or entity expending the contributed money to publish the message. Reasonable minds can differ regarding whether there is, indeed, a constitutional basis for this distinction. *See Randall v. Sorrell*, 548 U.S. 230, 265-73 (2006) (Thomas, J., concurring).

21

The Court's distinction between contributions and expenditures is also evident in the discussion in *Buckley* of FECA's requirement that persons report contributions and expenditures made "for the purpose of . . . influencing" the nomination or election of candidates for federal office. *See Buckley*, 424 U.S. at 74-77. The Court held that, as applied to expenditures, this definition was unconstitutionally vague for the same reason that the limitation on direct expenditures "relative to a clearly identified candidate" was vague. To cure this deficiency so that the reach of the reporting requirement would not be impermissibly broad, the Court held that the reporting requirement applied only to expenditures "used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80. However, the Court held that the reporting requirement for contributions made "for the purpose of . . . influencing" a candidate election was not unconstitutionally vague or overbroad, finding that it bore "a sufficiently close relationship to the goals of the Act." *Id.* at 78.

In cases that more directly address limitations on campaign contributions as opposed to campaign expenditures, the Court has consistently deferred to congressional enactments limiting political campaign contributions. The Court has recently stated that its treatment of restrictions on contributions reflects "the limited burdens they impose on First Amendment freedoms . . . [and] the importance of the interests that underlie contribution limits—interests in preventing 'both the actual corruption threatened by large financial contributions and the eroding of public confidence

However, since the *Buckley* decision in 1976, the Court has been consistent in preserving a constitutional distinction between contributions and expenditures, granting the expressive and associational interests in making contributions less constitutional protection than those in making direct expenditures to produce a message or promote a cause.

in the electoral process through the appearance of corruption.'" *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 136 (2003) (quoting *Federal Election Comm'n v. National Right to Work Comm.*, 459 U.S. 197, 208 (1982)); *accord Wisconsin Right to Life, Inc.*, 127 S. Ct. at 2665. The *McConnell* court added:

> [W]hen reviewing Congress' decision to enact contribution limits, there is no place for a strong presumption against constitutionality, of the sort often thought to accompany the words "strict scrutiny." The less rigorous standard of review we have applied to contribution limits (*Buckley's* "closely drawn" scrutiny) shows proper deference to Congress' ability to weigh competing constitutional interests in an area in which it enjoys particular expertise. It also provides Congress with sufficient room to anticipate and respond to concerns about circumvention of regulations designed to protect the integrity of the political process.

*McConnell*, 540 U.S. at 137 (quotation marks and citation omitted).[14]

The United States Supreme Court's deference to Congress with regard to limits on political contributions is even greater with respect to corporate political contributions, and is

---

[14] In 2006, the Court held the contribution limits imposed by Vermont's campaign finance statute to be an unconstitutional burden on free speech. *See Randall*, 548 U.S. at 262-63. The Court found that the Vermont statute's substantial restrictions on the ability of candidates to raise the funds necessary to run a competitive election, the ability of political parties to help their candidates get elected, and the ability of individual citizens to volunteer their time to campaigns were not sufficiently "closely drawn" to meet its objectives in light of its substantial burden on speech as required by *Buckley*. *Id.* at 253-56. The Court found the Vermont statute "too restrictive." Ellis and Colyandro do not make the sort of challenge brought in *Randall v. Sorrell* that the dollar limitations in the Texas election code are so low that they effectively stifle the political process. Or, as the *Randall* Court put it, that because the restrictions in that case were not sufficiently "closely drawn" they "disproportionately burdened" the First Amendment interests involved. Such an inquiry is dependent on the specific effects of the restrictions in question on the political process. This issue is not before us nor is the record in this case adequate to assess the merits of such a challenge even if we construed the briefing to raise it. Ellis and Colyandro's challenge, in contrast, focuses on a contributor's ability to understand what is and is not prohibited conduct from the face of the election code.

23

manifest in its treatment of federal laws governing corporate political activity. It is a federal offense for "any corporation whatever, or any labor organization to make a contribution or expenditure in connection with" certain federal elections, and for "any candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section." 2 U.S.C.A. § 441b(a) (2005). This statute, first enacted in 1907, grew out of "popular feeling that aggregated capital unduly influenced politics, an influence not stopping short of corruption." *United States v. United Auto. Workers*, 352 U.S. 567, 570 (1957). The Court recently observed that "[a]ny attack on the federal prohibition of direct corporate political contributions goes against the current of a century of congressional efforts to curb corporations' potentially 'deleterious influences on federal elections,' which we have canvassed a number of times before." *Federal Election Comm'n v. Beaumont*, 539 U.S. 146, 152 (2003) (quoting *Automobile Workers*, 352 U.S. at 585). After surveying the history of federal regulation of corporate campaign contributions and its opinions dealing with that regulation, the *Beaumont* Court wrote:

> As these excerpts from recent opinions show, not only has the original ban on direct corporate contributions endured, but so have the original rationales for the law. In barring corporate earnings from conversion into political "war chests," the ban was and is intended to "prevent corruption or the appearance of corruption." But the ban has always done further duty in protecting "the individuals who have paid money into a corporation or union for purposes other than the support of candidates from having that money used to support political candidates to whom they may be opposed."

> Quite aside from war-chest corruption and the interests of contributors and owners, however, another reason for regulating corporate electoral involvement has emerged with restrictions on individual contributions, and recent cases have recognized that restricting contributions by various organizations hedges against their use as conduits for "circumvention of [valid] contribution limits." To the degree that a corporation could contribute to political candidates, the individuals "who created it, who own it, or whom it employs," could exceed the bounds imposed on their own contributions

24

by diverting money through the corporation.  As we said on the subject of limiting coordinated expenditures by political parties, experience "demonstrates how candidates, donors, and parties test the limits of the current law, and it shows beyond serious doubt how contribution limits would be eroded if inducement to circumvent them were enhanced."

In sum, our cases on campaign finance regulation represent respect for the "legislative judgment that the special characteristics of the corporate structure require particularly careful regulation."  And we have understood that such deference to legislative choice is warranted particularly when Congress regulates campaign contributions, carrying as they do a plain threat to political integrity and a plain warrant to counter the appearance and reality of corruption and the misuse of corporate advantages.  As we said in *Colorado Republican*, "limits on contributions are more clearly justified by a link to political corruption than limits on other kinds of . . . political spending are (corruption being understood not only as quid pro quo agreements, but also as undue influence on an officeholder's judgment, and the appearance of such influence)."

*Id.* at 154-55 (citations omitted).  The *Beaumont* Court held that applying the federal prohibition on direct corporate contributions to nonprofit advocacy corporations did not violate the First Amendment.  *Id.* at 149.

The United States Supreme Court has also affirmed the constitutionality of a state law prohibiting corporate political contributions and expenditures.  *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990).  The Michigan Campaign Finance Act prohibits corporations from making contributions and independent expenditures in connection with state candidate elections, but exempts from this general prohibition expenditures made from a segregated fund created specifically for this purpose.  *Id.* at 655-56.  The issue before the Court was the act's ban on independent expenditures "in assistance of, or in opposition to, the nomination or election of a candidate."  *Id.* at 658.  The Court upheld the restrictions in the statute, holding that "[c]orporate wealth can unfairly influence elections when it is deployed in the form of independent expenditures,

25

just as it can when it assumes the guise of political contributions." *Id.* at 660. Reaffirming its view of restrictions on corporate political activity, the Court found that the Michigan statute is "targeted to eliminate the distortion caused by corporate spending while also allowing corporations to express their political views" through the use of separate, segregated funds. *Id.* The Court rejected the Chamber's argument that the act was overbroad because it applied to closely held corporations that do not possess vast reservoirs of capital, holding that "the potential for distorting the political process" justified the general application of the statute to all corporations. *Id.* at 661.[15]

More recently, the Court has held that a nonprofit, nonstock, ideological advocacy corporation cannot constitutionally be prohibited by the Bipartisan Campaign Reform Act of 2002 from spending its treasury funds to engage in "issue advocacy," that is, the publication of ads on public policy issues that did not expressly advocate for the election or defeat of a clearly identified candidate. *Wisconsin Right to Life*, 127 S. Ct. at 2673. The Court reaffirmed, in a somewhat fractured set of opinions, the *Buckley* express advocacy/issue advocacy distinction with

---

[15] The Court also rejected the Chamber's argument that it was a "nonprofit ideological corporation" entitled to a First Amendment exemption from the prohibition on corporate campaign expenditures. *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 661-65 (1990). By this argument, the Chamber sought to bring itself within the scope of the holding in *Federal Election Commission v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986). In that case, after acknowledging "the legitimacy of Congress' concern that organizations that amass great wealth in the economic marketplace not gain unfair advantage in the political marketplace," the Court held that the federal prohibition against direct corporate campaign spending violated the First Amendment when applied to the MCFL because (1) it was formed for the express purpose of promoting political ideas and could not engage in business activities; (2) it had no shareholders or other persons affiliated so as to have a claim on its assets or earnings; and (3) it was not established by a business corporation or labor union, and had a policy of not accepting contributions from such entities. *Id.* at 263-64. Ellis and Colyandro do not contend that the *MCFL* holding applies to any of the corporations that made the contributions alleged to be unlawful in the prosecutions at issue here.

respect to expenditures and applied it to a corporate entity making direct expenditures to participate in "issue advocacy."[16] With this backdrop of constitutional jurisprudence, we turn to a review of the Texas election code provisions at issue.

**Level of Constitutional Review**

As to whether the election code's restrictions on corporate campaign contributions are subject to strict scrutiny or must only satisfy a less rigorous test such as being "closely drawn" to meet a "sufficiently important interest" or being "carefully tailored to meet reasonable legislative objectives in curtailing corruption in the political process," we are guided by the decisions of the United States Supreme Court. The Court has regularly and consistently deferred to legislative judgment on restrictions of corporate campaign contributions, explaining that "the special characteristics of the corporate structure require particularly careful regulation." *Beaumont*, 539 U.S. at 155. The Court has also regularly upheld such restrictions if they are "closely drawn" to meet a "sufficiently important interest." *Id.* at 162. In light of binding United States Supreme Court precedent noted above and the currently applicable rationale of *Buckley v. Valeo* regarding the constitutional distinction between political expenditures and political contributions, we hold that the Texas Election Code's broad restrictions on the making and accepting of corporate campaign contributions—that is, contributions of corporate funds to candidates and political committees intended for use in connection with campaigns for elective office—is not subject to a strict scrutiny

---

[16] What the decision in *Wisconsin Right to Life* may mean for restrictions on the political activities of for-profit, non-ideological business corporations and state restrictions on corporate contributions from such corporations is not entirely clear.

analysis, but a less rigorous standard as articulated in *Buckley*, *Beaumont*, and *McConnell* that the restrictions be "closely drawn" or "narrowly tailored" to meet a "sufficiently important interest."

**Overbreadth**

In determining whether the challenged election code provisions are unconstitutional, we start with the presumption that the statute is valid and that the legislature acted in a constitutionally sound fashion. *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002). We will uphold the statute if it can be reasonably construed in a manner that will render it constitutional and carry out legislative intent. *Ely v. State*, 582 S.W.2d 416, 419 (Tex. Crim. App. 1979).

Ellis and Colyandro's overbreadth argument is straightforward. They start from the proposition that *Buckley* prohibits the legislature from restricting issue advocacy,[17] and then argue that, since the statutory phrase "in connection with a campaign for elective office" as used in the election code with respect to corporate contributions is broad enough to encompass issue advocacy, it is unconstitutionally overbroad. However, as we have noted, controlling United States Supreme Court precedent has not drawn the express advocacy/issue advocacy distinction for corporate political contributions, nor has the Court applied strict scrutiny to statutory restrictions on corporate political contributions. The Court has consistently upheld restrictions on corporate political contributions and even outright bans on certain types of corporate contributions as long as

---

[17] This proposition was rejected by the Court in *McConnell*. "[T]he express advocacy restriction was an endpoint of statutory interpretation, not a first principle of constitutional law." *McConnell*, 540 U.S. at 190. The Court clarified in *McConnell* that *Buckley* was specific to the statutory language at issue there and "in no way drew a constitutional boundary that forever fixed the permissible scope of provisions regulating campaign-related speech." *Id.* at 192-93.

28

the restrictions were "closely drawn"—under the *Buckley* rationale—to meet important governmental interests such as "combating the appearance or perception of corruption engendered by large campaign contributions" like those that could come from corporate contributors. *McConnell*, 540 U.S. at 143-44. In fact, as noted above, the Court has upheld restrictions that are similar to the restrictions at issue here at both the federal and state levels. Consequently, we are of the view that there is no basis in the current jurisprudence to apply an express advocacy limiting construction to the corporate contribution restrictions in the Texas election code.

We also emphasize that to prevail on their facial challenge to the overbreadth of the relevant election code provisions, Ellis and Colyandro must demonstrate that the restrictions, in fact, reach a substantial amount of protected conduct. *City of Houston v. Hill*, 482 U.S. 451, 458 (1987). A statute will not be invalidated for overbreadth merely because it is possible to imagine some unconstitutional applications. *Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 436 (Tex. 1998). The overbreadth doctrine is "strong medicine" and should be employed "only as a last resort." *New York v. Ferber*, 458 U.S. 747, 769 (1982) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). There must be a realistic danger that the statute will significantly compromise recognized First Amendment protections of parties not before the court. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).

Ellis and Colyandro have not met this burden. In light of the United States Supreme Court precedent expressly allowing the type of regulation of corporate campaign contributions about which Ellis and Colyandro complain, we are not convinced that the Texas Election Code provisions in question reach a substantial amount of protected activity as contemplated by the case law.

29

Therefore, consistent with binding United States Supreme Court precedent, we decline Ellis and Colyandro's invitation to strike down the election code's restrictions on corporate campaign contributions on the basis that they are unconstitutionally overbroad because they could be read to encompass both express advocacy as well as issue advocacy.

**Vagueness**

Turning to Ellis and Colyandro's vagueness challenge, Ellis and Colyandro complain that "[a] person of ordinary intelligence is not given a reasonable opportunity to know what is prohibited by laws providing that a corporation cannot make, and a person cannot accept, a contribution with the intent that it be used 'in connection with a campaign for elective office.'" They punctuate this point with the statement: "If one wishes to make a donation to a group to advocate in favor of an issue that is the cornerstone of a particular candidate's campaign, is one making a donation 'in connection with' that candidate's campaign? Who knows?"

We recognize that the phrase "in connection with a campaign" is broad. We presume the legislature intended it to be broad. We also recognize that the elaborate structure for regulating political contributions in the election code is complicated and a challenge for "a person of ordinary intelligence" to understand and navigate. We further recognize that in some instances there may well be considerable challenges for prosecutors and fact finders in dealing with evidentiary issues relating to a contributor's intent or distinguishing between authorized or unauthorized contributions, and therefore, criminal and innocent behavior. However, complexity is not synonymous with unconstitutional vagueness. In crafting the challenged election code provisions, the legislature followed the constitutional guidelines articulated by the United States Supreme Court in *Buckley*

30

and its progeny. Viewed in light of the controlling United States Supreme Court precedent, the challenged election code provisions are not so indefinite that they fail to give reasonable notice of what is prohibited with respect to corporate contributions, fail to provide law enforcement with sufficiently determinate guidelines for enforcement, or unconstitutionally chill protected expression.

Statutes are to be read as a whole and interpreted to give effect to every part. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 26 (Tex. 2003). Although Ellis and Colyandro argue that contributions to support measures or other permitted purposes could be criminalized—as a practical matter—if the statute were applied improperly or the finder of fact misjudges the evidence, their argument goes to the possibility of erroneous application of the statute rather than the propriety of the language of the statute on its face. The statute plainly allows corporations to make contributions to support or oppose a measure and to cover administrative expenses. Contributions to political committees to support advocacy on such "measures" in elections are specifically authorized by the election code. Tex. Elec. Code Ann. § 253.096. Here, whether the corporations intended the contributions to be for specific candidates or for the support or opposition of a measure is a question of fact—and therefore, an issue of evidence and proof—as are the nature of the circumstances surrounding Ellis and Colyandro's acceptance or handling of the contributions. The statute is definite enough *in its language* to communicate that corporate contributions given with the intent to support measures are permissible while corporate contributions given with the intent to support candidates are not.

We believe that a person of ordinary intelligence is capable of properly designating whether his or her contribution is intended to support or oppose a measure (lawful), be used solely

31

for administrative expenses (lawful), be used for unregulated expenditures (lawful), or be used to "in connection with" a candidate's campaign (unlawful). To the extent Ellis and Colyandro complain that this statutory structure could subject a person to penalty simply for being mistaken about what a contributor intends, the statute places burdens on those making and accepting corporate contributions to designate and to ascertain the purpose of a contribution before giving it or using it in a campaign for elective office. In light of the United States Supreme Court's pronouncements in this area, we cannot find this burden unconstitutional, and we defer to the legislature's judgment on this point.

Ellis and Colyandro also complain that the election code permits corporations to finance the establishment and administration of general-purpose political committees, but it does not define "establishment" or "administration." They argue that, as a result, the distinction between a lawful corporate expenditure or contribution to establish or administer a general-purpose committee and an unlawful corporate campaign contribution to such a committee is unconstitutionally vague.

A statute is not unconstitutionally vague merely because it fails to define words or terms used. *Anderson*, 902 S.W.2d at 699. When words are not defined, they are ordinarily given their plain meaning unless the statute shows that they were used in some other sense. *Id.* In the absence of special definitions, statutory language can be measured by common understanding and practices or construed in the sense generally understood. *Id.*

The Texas Ethics Commission has held that the guide for determining whether a particular expense is "administrative" under section 253.100 is whether the expense is one that would be incurred in the normal course of business by any active organization, whether or not it engaged in political activity. Op. Tex. Ethics Comm'n No. 132 (1993). Similarly, a permissible

32

"establishment" expense is one that would be incurred by any organization, political or non-political. Examples of administrative expenses include expenditures on office rent, utilities, and office supplies. *Id.* By contrast, expenses that are tied directly to a political committee's support for or opposition to candidates or measures are not administrative expenses. Examples of such non-administrative expenses include expenses to host a public reception for an identified candidate and expenses for meetings of members of the general-purpose committee with candidates for elective office. *Id.* "Even though the requestor specifies that no public communication or endorsement of any candidate would be made at such a meeting, the activity described represents an initial phase of the committee's political activity." *Id.* Other categories of expenses, including, for example, expenses for postage, printing and stationery, travel, staff salaries, and legal fees, may be classified as part administrative expenses and part political activity expenses, depending on the circumstances of each case. *Id.* Such expenses are generally considered administrative; however, to the extent that the expenses encompass political activity, they are not administrative. *Id.* For example, if an employee of the general-purpose committee is compensated for his activities that support or oppose a political candidate, the portion of his salary attributable to those activities is not an administrative expense. *Id.* Considering these principles and examples, we believe that a person of ordinary intelligence is capable of intending and designating his or her contributions to a political committee to be for lawful purposes unrelated to supporting or opposing a political candidate. Whether misuse of such funds by the political committee or innocent redistribution of such funds for unlawful purposes may have implications for the contributor or raise additional constitutional concerns is not before us in this appeal.

33

Additional clarification of what is and is not permitted can be found in the election code's definitions of general-purpose committee and specific-purpose committee. These definitions state that a "political committee" has "a principal purpose" of either (1) accepting contributions made with the intent to support or oppose one or more candidates, officeholders, or measures, or (2) making expenditures for such purposes. *See* Tex. Elec. Code Ann. § 251.001(13), (14). Consistent with these definitions, the Texas Ethics Commission has defined "political committee" in its rules, in relevant part, as "[t]wo or more persons that have as a principal purpose accepting political contributions or making political expenditures *to support or oppose candidates, officeholders, or measures*." 1 Tex. Admin. Code § 20.1(14) (2004) (emphasis added). These limitations also provide that a "political contribution" to a "political committee" is a "contribution . . . offered or given with the intent that it be used in connection with a campaign for elective office" "*to support or oppose candidates*." Tex. Elec. Code Ann. § 251.001(3); 1 Tex. Admin. Code § 20.1(14) (emphasis added).

In our view, a reasonable person of ordinary intelligence is capable of distinguishing between making contributions for the purpose of being used to defray unregulated expenses that are unrelated to any kind of political campaign and those that are campaign-related and, therefore, regulated. While reasonable minds might differ as to the utility and effectiveness of a regulatory structure such as that currently applicable to corporate political contributions in the election code, the current structure does not run afoul of constitutional protections. We hold that section 253.094 of the Texas Election Code is not unconstitutionally vague on its face.

34

We have found that the election code's prohibition on corporate political contributions is not unconstitutionally vague or overbroad. It follows that section 253.003 is not vague or overbroad insofar as it criminalizes the acceptance of an unlawful corporate political contribution that is known to be unlawful by the person accepting it.

**Money Laundering Statute**

A person commits the offense of money laundering if he "conducts, supervises, or facilitates a transaction involving the proceeds of criminal activity." Tex. Penal Code Ann. § 34.02(a)(2). "Proceeds" are defined to mean "funds" acquired or derived directly or indirectly from, produced through, or realized through an act. *Id.* § 34.01(4). Before 2005, section 34.01 defined "funds"[18] to include:

> (A) coin or paper money of the United States or any other country that is designated as legal tender and that circulates and is customarily used and accepted as a medium of exchange in the country of issue;
>
> (B) United States silver certificates, United States Treasury notes, Federal Reserve System notes; and
>
> (C) official foreign bank notes that are customarily used and accepted as a medium of exchange in a foreign country and foreign bank drafts.

*Id.* § 34.01(2). In 2005, after the acts at issue in these causes were committed, section 34.01 was amended to add an additional category of items that the term "funds" would include:

---

[18] The term "funds" is not defined in the statute. Rather, the statute gives examples of what the term includes. It does not, however, describe what the term excludes nor everything the term might include.

35

(D) currency or its equivalent, including an electronic fund, personal check, bank check, traveler's check, money order, bearer negotiable instrument, bearer investment security, bearer security, or certificate of stock in a form that allows title to pass on delivery.

*Id.* § 34.01(2)(D) (West Supp. 2008).

Ellis and Colyandro are charged under the 2004 set of indictments with money laundering by delivering a personal check to the Republican National State Elections Committee. They assert that, if the term "funds" in the pre-2005 version of the money laundering statute is interpreted to include checks and the other items added by the 2005 amendment to the statute, the pre-2005 version of the statute is unconstitutionally vague on its face because it fails to give constitutionally adequate notice that a person could be convicted of money laundering based solely on handling checks, money orders, or other negotiable instruments. The essence of their argument is that, if the pre-2005 version of the money laundering statute is read to criminalize transactions in which the "proceeds of criminal activity" were something other than funds in the form of cash or cash equivalent, the statute is unconstitutionally vague on its face because a reasonable person of ordinary intelligence would not know from reading the statute that a check, money order, or other negotiable instrument (items added by the 2005 amendment to the statute) fall within the ambit of the term "funds." Ellis and Colyandro concede that if the pre-2005 version of the statute does not criminalize transactions involving forms of payment other than cash or cash equivalents, it passes constitutional muster, and their vagueness argument fails.[19]

---

[19] The State argues that Ellis and Colyandro's constitutional challenge to section 34.01 is not truly a facial challenge to the statute, but really an "as applied" challenge for which pretrial habeas corpus relief is not available. The State's characterization of the Appellants' argument presupposes

According to the applicable version of section 34.01, the term "funds" *includes* United States currency, the currency of any other country, United States silver certificates, United States Treasury notes, Federal Reserve System notes, official foreign bank notes that are customarily used and accepted as a medium of exchange in a foreign country, and foreign bank drafts. "Includes" is a term of enlargement and not of limitation or exclusive enumeration and does not create a presumption that components not expressed are excluded. Tex. Gov't Code Ann. § 311.005(13) (West 2005). However, principles of statutory construction also instruct that "when words of a general nature are used in connection with the designation of particular objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation." *See State v. Fidelity & Deposit Co. of Md.*, 223 S.W.3d 309, 312 (Tex. 2007) (quoting *Hilco Elec. Coop. v. Midlothian Butane Gas Co.*, 111 S.W.3d 75, 81 (Tex. 2003)). In other words, this requirement of *ejusdem generis* allows a term to be enlarged only as to items of the same kind, class, or nature as the other items on the list. *Id.* Therefore, checks and other negotiable instruments must be comparable to and appropriately classified as the same kind, class, or nature as the items enumerated in the pre-2005 version of section 34.01(2) to be included within the ambit of the term "funds" in the version of section 34.01 under which Ellis and Colyandro were indicted.[20] We are of

a particular answer to it—i.e., that the statute should be construed in the manner the State contends, and if it is, Ellis and Colyandro's attack can only be mounted as an "as applied" challenge. However, Ellis and Colyandro have, in fact, made and briefed a facial constitutional challenge to section 34.01 based on the proper construction to give the statute. Consequently, we address the question presented. To the extent Ellis and Colyandro may also have or, at some point, make an "as applied" challenge to either the election code or the money laundering statute, such issues are not before us and we express no opinion on them.

[20] As noted above, the term "funds" in section 34.01(2) did not expressly include checks or other negotiable instruments until the legislature amended the statute in 2005. By contrast,

37

the opinion that the term "funds" in the pre-2005 version of the money laundering statute cannot be fairly read to have tacitly included checks and other negotiable instruments that do not function as cash such as those added to the statute in 2005.

The term "funds" is described in the applicable version of the statute as including "coin or paper money of the United States or any other country that is designated as legal tender and that circulates and is customarily used and accepted as a medium of exchange in the country of issue," as well as United States silver certificates, United States Treasury notes, Federal Reserve System notes, official foreign bank notes that are customarily used and accepted as a medium of exchange in a foreign country, and foreign bank drafts. Tex. Penal Code Ann. § 34.01(2)(A). The Uniform Commercial Code defines "money" as "a medium of exchange currently authorized or adopted by a domestic or foreign government." Tex. Bus. & Com. Code Ann. § 1.201(b)(24) (West Supp. 2008). A check, on the other hand, is "simply an order to the drawee bank to pay the sum stated, signed by the maker and payable on demand." *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992).

Coin, currency, cash, or items that function as cash equivalents are, themselves, payment. By contrast, a check is a promise or commitment to make payment when the check is later presented for payment. Accordingly, payment by check that is not guaranteed in some way, such as a cashier's check or teller's check, is not payment in the same sense as payment by cash or cash equivalent. A check is "a written message to the drawee to pay money in accordance with the order, and thus its primary function is to facilitate payment of an obligation." Fred H. Miller

the federal money laundering statute has expressly applied to "monetary instruments"—with checks and other negotiable instruments included in its definition of "monetary instruments"—since its passage in 1986. *See* 18 U.S.C.A. § 1956 (2000 & Supp. 2008).

38

& Alvin C. Harrell, *The Law of Modern Payment Systems and Notes* § 1.01(4)(a) (2002). The recipient of the check does not receive actual payment until he negotiates the check and some third party, such as a bank, makes payment to the recipient in exchange for the check. If the check is presented for payment at a bank, but the account from which payment is to be drawn contains insufficient funds, the drawer of the check has stopped payment, the signature on the check turns out to be forged, or any of a number of other complications arise, the presenter of the check may not receive payment.

Cash or cash equivalents such as currency, Treasury notes, silver certificates, foreign bank drafts,[21] cashier's checks, or other forms of payment similar to those enumerated in the pre-2005 version of section 34.01 are not at all similar to checks or other non-guaranteed negotiable instruments as a medium of exchange. Cash or a cash equivalent is, without more, a form of payment, and once the currency or other cash equivalent is delivered, payment is accomplished and is no longer contingent on some future event. A check or other negotiable instrument such as those added to section 34.01 in 2005 are not in this category. As a form of payment or "medium of exchange," checks and other non-cash negotiable instruments are contingent on the drawer's order

---

[21] "Foreign bank drafts" are orders of payment drawn by an authorized officer of a foreign bank upon either his own bank or some other bank in which funds of his bank are deposited. When drawn by the bank on itself, such a draft is indistinguishable from a cashier's check and, therefore, functions as a form of cash equivalent. When drawn on the foreign bank's accounts in another bank (for instance, a U.S. bank), the draft constitutes a "teller's check" under the Uniform Commercial Code and the drawer bank is obligated to pay damages resulting if the draft is not honored. Consequently, the drawer bank is essentially obligated to honor the draft once it is issued. Therefore, as a medium of exchange, these types of bank drafts—particularly if payable to bearer—are often treated as the functional equivalent of cash in our banking system and, therefore, of the same kind or class as the other items listed in the 2002 version of section 34.01. *See* Tex. Bus. & Com. Code Ann. §§ 3.104(h), 3.411 (West 2002); *see also Michie on Banks and Banking*, ch. XII, § 13 (2007), 5 Harold Weisblatt, *Banking Law* § 112.02[3][a] (2007), 1 Henry J. Aiely & Richard B. Hagedorn, *Brady on Bank Checks*, § 1.17 (2003).

to pay being honored by the drawee at some point in the future. In contrast, the delivery of cash or a cash equivalent as a medium of exchange, such as those items listed in the pre-2005 version of section 34.01, accomplishes actual payment at the moment of delivery.

Considering these fundamental differences between cash (or a cash equivalent such as a U.S. Treasury note) and non-guaranteed checks and other negotiable instruments, and applying the rule of *ejusdem generis*, which allows a term to be enlarged only as to items of the same kind, class, or nature as the other items on the list, we are of the view that checks and other negotiable instruments are not comparable to or appropriately classified with the items included in the pre-2005 definition of "funds" in section 34.01, which included only mediums of exchange that function as cash or true cash equivalents. The 2002 version of the statute lists items that can be categorized as currency or some form of fungible, "customarily used and accepted" medium of exchange—items that are, by themselves, a form of payment. The listed items do not include non-cash personal promises or commitments to pay such as checks, promissory notes, IOUs, contracts, negotiable instruments, or any other form of promise to pay that falls short of actual payment or something that is, without more, accepted as a medium of exchange.

It is too much of a leap for us to conclude that a reasonable person of ordinary intelligence would look at the pre-2005 version of section 34.01 and be aware that it intended to criminalize the "laundering" of checks, negotiable instruments, promissory notes, and other contractual orders or promises to pay in addition to the well-known concept of criminalizing the handling of fungible cash or cash equivalent items such as those expressly listed in the statute. If section 34.01 were intended to apply to items such as checks, negotiable instruments, and other

40

such commitments to pay that are not in themselves payment, such application would need to derive from something more explicit than inferential reasoning from the broadest possible interpretation of the term "funds," a definition of the term that does not include checks or other negotiable instruments, and a definition that includes only forms of payment or mediums of exchange that are accepted without further guarantee.[22] This conclusion is buttressed by the fact that the legislature did add a completely new category of items to the definition of "funds" in 2005 that included checks and other negotiable instruments.

The legislative history of the original statute indicates that when the Texas money laundering statute was adopted in 1993, the legislature anticipated that the statute would primarily apply to the cash proceeds of drug crimes and other criminal activity. According to the House of Representatives' Committee on Criminal Jurisprudence: "H.B. 354 recommends a distinctive strategy that shifts the emphasis on following the drugs to one that follows the money." This shift was recommended because of the "[a]pproximately $150 billion from illegal drug sales that is laundered each year—all of it cash." House Comm. on Criminal Jurisprudence, Bill Analysis, Tex. H.B. 354, 73d Leg., R.S. (1993). The analysis continues: "By taking a few money launderers out of circulation, H.B. 354 would effectively paralyze drug ring operations and create bottlenecks in the flow of illegal funds." *Id*. According to this bill analysis, the legislature's intent in adopting

---

[22] As an example, the federal money laundering statute criminalizes conducting a financial transaction with the proceeds of specified unlawful activity. Under the federal statute, the term "financial transaction" expressly includes "monetary instruments" and the definition of "monetary instruments" expressly includes checks and other negotiable instruments. *See* 18 U.S.C.A. § 1956. The Texas legislature declined to adopt such an approach when passing its original version of a money laundering statute in 1993.

41

the original money laundering statute was to combat illicit drug trade by focusing on the cash involved in the transactions. The list of examples of what constitutes "funds" in the original statute is consistent with the bill analysis's statement that the legislature intended that it include only items that functioned as cash or true cash equivalents.

The primary rule in statutory interpretation is that a court must give effect to legislative intent. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 383 (Tex. 2000). When determining legislative intent, we look to the language of the statute, as well as its legislative history, the objective sought, and the consequences that would flow from alternate constructions. *Id.* The fact that the legislature contemplated the statute would apply to the cash proceeds of illicit drug activity supports Ellis and Colyandro's argument that the statute in effect in 2002 did not intend to tacitly include checks, negotiable instruments, or other forms of contractual commitments to pay in the future.

As further support for their position, Ellis and Colyandro cite the 2005 amendment to section 34.01(2), which added the category of checks and other non-cash monetary instruments to the definition of the term "funds." They argue that the legislature's addition of checks and other negotiable instruments by amendment indicates that these items were not included in the earlier version of the statute. We agree that, in this instance, construing the amendments as a change to the original statute is consistent with an appropriate construction of that statute. While one legislature's interpretation of a prior legislature's enactment may be persuasive, it is not dispositive of the interpretation to be given the prior enactment. *State Highway Dep't v. Gorham*, 162 S.W.2d 934, 937 (Tex. 1942). Nonetheless, if later legislation differs significantly from existing law, the later

legislation changes rather than clarifies existing law. *Williamson Pointe Venture v. City of Austin*, 912 S.W.2d 340, 345 (Tex. App.—Austin 1995, no pet.); *see Tijerina v. City of Tyler*, 846 S.W.2d 825, 828 (Tex. 1992) (finding that an amendment changes rather than clarifies a statute where the amendment directly contradicts that plain wording of previous versions of the statute). In the absence of some showing, either by legislative history or otherwise, that the intent of the legislature in adopting the amendment was to clarify rather than change the statute in question, the presumption is of change rather than clarification. *Williamson Pointe Venture*, 912 S.W.2d at 345; *Adams v. Texas State Bd. of Chiropractic Exam'rs*, 744 S.W.2d 648, 656 (Tex. App.—Austin 1988, no writ).

Courts have upheld the presumption of change, for example, where terms are redefined or where additional items are specifically added to existing definitions. *See Williamson Pointe Venture*, 912 S.W.2d at 345 (recognizing that the amendment changed rather than clarified the statute where the definition of "regulatory agency" was amended to specifically include governing bodies of cities when issuing a permit, "project" was redefined, and a section of exclusions was added). The presumption of change is not overcome where the amendment merely recites how courts have already interpreted the statute. *See Adams*, 744 S.W.2d at 656 (holding that the presumption that the legislature intended to change rather than amend a law is not overcome where the amendment merely recites courts' prior interpretations of the statute and where another section of the statute already contained similar language).

When determining whether an amendment such as that in question here was a change or clarification, we may review the legislative history and former statutory provisions. Tex. Gov't

Code Ann. § 311.023 (West 2005). The 2005 amendment to section 34.01 was added by House Bill 3376. *See* Act of May 30, 2005, 79th Leg., R.S., ch. 1162, § 1, 2005 Tex. Gen. Laws 3802, 3802. According to the bill analysis of the bill as engrossed, section 1 "amends sections 34.01(2) and (3), Penal Code, to *redefine* 'funds' and to define 'financial institution.'" Senate Comm. on Bus. & Comm., Bill Analysis, Tex. H.B. 3376, 79th Leg., R.S. (2005) (emphasis added). In addition, the analysis of the House Research Organization explains: "CSHB 3376 would *expand* the definition of 'funds' to include money other than cash." House Research Organization, Bill Analysis, Tex. H.B. 3376, 79th Leg., R.S. (2005) (emphasis added). This report also noted that the committee substitute for the original bill "would provide a more expansive definition of 'funds'" than the version of section 34.01 existing at the time. *Id*. It would not be possible for the legislature to have expanded the definition of "funds" in the statute to include money other than cash if the statute already included the items added by the 2005 amendment.[23] The House Research Organization bill analysis went on to state that supporters of the bill offered this rationale for its adoption to the committee:

> Under current law [the pre-2005 version of section 34.01], prosecutors may not prosecute offenders for money-laundering if the offender received a form of money other than cash, such as checks or money orders. This is inadequate as it prevents prosecution under this statute in an array of cases. CSHB 3376 [the bill that amended the statute in 2005] would fix this problem by covering money received in a variety of forms other than cash.

---

[23] It is worth noting that the legislature had the federal statute at its disposal in 1993 when it enacted the original version of section 34.01. The federal statute expressly included "monetary instruments" that included checks in addition to "funds." The legislature opted at that time for a formulation of the Texas statute that did not include "monetary instruments," "money other than cash," or any other form of payment that did not function as cash. In 2005, the legislature revisited this approach and changed it. When the legislature looks to another jurisdiction's statute, but modifies rather than adopts some of its provisions, it does so purposefully. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 497 (Tex. 2001).

*Id.* Thus, there is unequivocal legislative history indicating that the 2005 amendments were intended to change the statute and change it to include non-cash negotiable instruments such as checks. There is no legislative history or indication in the text of the statute to the contrary. The legislative history, the text of the statute, the category of items included in the pre-2005 definition of "funds" in the statute, and the category of items added to the definition of "funds" in 2005 are all consistent with the conclusion that the legislature did not intend for the term "funds" to include non-cash type items such as those added to the statute in 2005 when it originally passed the statute in 1993.

As noted above, we will uphold a statute if it is reasonably construed in a manner that will render it constitutional and carry out legislative intent. *Ely v. State*, 582 S.W.2d 416, 419 (Tex. Crim. App. 1979). Based on accepted principles of statutory interpretation—presuming a change when an amendment alters a statute rather than a clarification—and an examination of statutory text as well as the legislative history, we find that checks and other negotiable instruments were added to the description of the term "funds" in section 34.01 in 2005 precisely because they were not included in the prior version of the statute. We find that the term "funds" in the pre-2005 money laundering statute did not include checks or other negotiable instruments that are not the functional equivalent of cash.[24] Since we hold that checks and other negotiable instruments such as

---

[24] We note that two reported cases have involved prosecutions for violation of the pre-2005 money laundering statute via the use of checks. *Davis v. State*, 68 S.W.3d 273 (Tex. App.—Dallas 2002, pet. ref'd); *Lee v. State*, 29 S.W.3d 570 (Tex. App.—Dallas 2000, no pet.). Neither case involved a challenge to the constitutionality of section 34.01 based on the definition of "funds" or any issue as to whether the term "funds" in the statute included or did not include checks or other negotiable instruments. The issue in this case was not raised nor litigated in those cases, and the courts did not address or express any view on it. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Indus. v. Aviall Servs.*, 543 U.S. 157, 170 (2004); *see also Cox v. Dallas Levee Improvement Dist.*, 258 S.W.2d 851, 858 (Tex. Civ. App.—Dallas 1953, writ ref'd n.r.e.) ("A decision cannot be stare decisis of an issue which was not presented to or passed upon in the case, cited as controlling, even though it involves the same subject matter.");

those added by the amendments to section 34.01 in 2005 were not included within the definition of the term "funds" as it was defined in the statute at the time of the acts at issue here, Ellis and Colyandro's contention that the statute under which they have been charged is unconstitutionally vague on its face fails.

**Conclusion**

The election code's prohibitions on the making and accepting of corporate political contributions are not unconstitutionally vague or overbroad. The challenged statutes give constitutionally adequate notice of the conduct prohibited and sufficiently determinate guidelines for law enforcement. The pre-2005 version of the money laundering statute is not unconstitutionally vague on its face. Consequently, we affirm the district court's orders denying habeas corpus relief.

_____

G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed: August 22, 2008

Publish

_____

*Eubanks v. State*, 203 S.W.2d 339, 342 (Tex. Civ. App.—Austin 1947, writ ref'd) ("[T]he issue here involved was not raised in that case, not presented to the court, and not passed upon by the court. Hence that decision could not be stare decisis of the question here presented."). The parties here quite rightly declined to cite, rely on, or brief the *Lee* and *Davis* cases in this case.